# EXHIBIT A

PURCHASE AND ASSUMPTION AGREEMENT

WHOLE BANK

ALL DEPOSITS

AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF COLORADO CAPITAL BANK,
CASTLE ROCK, COLORADO

FEDERAL DEPOSIT INSURANCE CORPORATION

and

FIRST-CITIZENS BANK & TRUST COMPANY

DATED AS OF

JULY 8, 2011

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

Colorado Capital Bank
Castle Rock, Colorado

# PURCHASE AND ASSUMPTION AGREEMENT

## TABLE OF CONTENTS

ARTICLE I.   GENERAL ................................................................. 1

1.1  Purpose ........................................................................... 1
1.2  Shared-Loss Agreements ............................................. 1
1.3  Defined Terms ............................................................... 2

ARTICLE II.  ASSUMPTION OF LIABILITIES ......... 9

2.1  Liabilities Assumed by Assuming Institution ........... 9
2.2  Interest on Deposit Liabilities ................................... 10
2.3  Unclaimed Deposits .................................................... 11
2.4  Employee Plans ........................................................... 11

ARTICLE III. PURCHASE OF ASSETS ........................ 11

3.1  Assets Purchased by the Assuming Institution ...... 11
3.2  Asset Purchase Price .................................................. 12
3.3  Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. ........................................................ 12
3.4  Puts of Assets to the Receiver .................................. 12
3.5  Assets Not Purchased by Assuming Institution ..... 15
3.6  Retention or Repurchase of Assets Essential to Receiver ........................................................................ 16
3.7  Receiver's Offer to Sell Withheld Loans ................. 17

ARTICLE IV. ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS ................................................... 17

4.1  Continuation of Banking Business ........................... 17
4.2  Credit Card Business .................................................. 17
4.3  Safe Deposit Business ................................................ 17
4.4  Safekeeping Business ................................................. 18
4.5  Trust Business .............................................................. 18
4.6  Bank Premises ............................................................. 19
4.7  Agreement with Respect to Leased Data Management Equipment ........................................... 22
4.8  Certain Existing Agreements ................................... 23
4.9  Informational Tax Reporting ................................... 24
4.10 Insurance ...................................................................... 24
4.11 Office Space for Receiver and Corporation; Certain Payments ...................................................... 24
4.12 Continuation of Group Health Plan Coverage for Former Employees of the Failed Bank ................... 25
4.13 Interim Asset Servicing .............................................. 26
4.14 [RESERVED] ............................................................... 26
4.15 Loss Sharing ................................................................. 26

ARTICLE V.  DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK ........................ 26

5.1  Payment of Checks, Drafts, Orders and Deposits ... 26
5.2  Certain Agreements Related to Deposits ............... 27
5.3  Notice to Depositors ................................................... 27

ARTICLE VI. RECORDS ................................................. 27

6.1  Transfer of Records .................................................... 27
6.2  Transfer of Assigned Records ................................. 28
6.3  Preservation of Records ............................................ 28
6.4  Access to Records; Copies ........................................ 28
6.5  Right of Receiver or Corporation to Audit ........... 28

ARTICLE VII. BID; INITIAL PAYMENT ................... 29

ARTICLE VIII. ADJUSTMENTS .................................... 29

8.1  Pro Forma Statement ................................................. 29
8.2  Correction of Errors and Omissions; Other Liabilities ..................................................................... 29
8.3  Payments ...................................................................... 30
8.4  Interest .......................................................................... 30
8.5  Subsequent Adjustments ............................................ 30

ARTICLE IX. CONTINUING COOPERATION ......... 30

9.1  General Matters .......................................................... 30
9.2  Additional Title Documents .................................... 30
9.3  Claims and Suits .......................................................... 30
9.4  Payment of Deposits .................................................. 31
9.5  Withheld Payments .................................................... 31
9.6  Proceedings with Respect to Certain Assets and Liabilities ..................................................................... 31
9.7  Information ................................................................. 32
9.8  Tax Ruling .................................................................... 32

ARTICLE X.  CONDITION PRECEDENT ................. 32

ARTICLE XI. REPRESENTATIONS AND WARRANTIES OF THE ASSUMING INSTITUTION . 33

11.1 Corporate Existence and Authority ........................ 33
11.2 Third Party Consent .................................................. 33
11.3 Execution and Enforceability .................................. 33
11.4 Compliance with Law ................................................ 33
11.5 Insured or Guaranteed Loans .................................. 33
11.6 Representations Remain True ................................. 34
11.7 No Reliance; Independent Advice .......................... 34

ARTICLE XII INDEMNIFICATION ............................ 34

12.1 Indemnification of Indemnitees .............................. 34
12.2 Conditions Precedent to Indemnification ............. 37
12.3 No Additional Warranty ........................................... 38
12.4 Indemnification of Receiver and Corporation ..... 38
12.5 Obligations Supplemental ........................................ 38
12.6 Criminal Claims .......................................................... 39
12.7 Limited Guaranty of the Corporation .................... 39
12.8 Subrogation ................................................................. 39

ARTICLE XIII MISCELLANEOUS ............................... 39

13.1 Expenses ....................................................................... 39

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

i

Colorado Capital Bank
Castle Rock, Colorado

| | | |
|---|---|---|
| 13.2 | Waiver of Jury Trial | 39 |
| 13.3 | Consent; Determination or Discretion | 39 |
| 13.4 | Rights Cumulative | 40 |
| 13.5 | References | 40 |
| 13.6 | Notice | 40 |
| 13.7 | Entire Agreement | 41 |
| 13.8 | Counterparts | 41 |
| 13.9 | Governing Law | 41 |
| 13.10 | Successors | 41 |
| 13.11 | Modification | 41 |
| 13.12 | Manner of Payment | 41 |
| 13.13 | Waiver | 41 |
| 13.14 | Severability | 42 |
| 13.15 | Term of Agreement | 42 |
| 13.16 | Survival of Covenants, Etc. | 42 |

## SCHEDULES

| | | Page |
|---|---|---|
| Excluded Deposit Liability Accounts | Schedule 2.1(a) | 44 |
| Purchase Price of Assets or any other assets | Schedule 3.2 | 45 |
| Excluded Securities | Schedule 3.5(l) | 47 |
| Data Retention Catalog | Schedule 6.3 | 48 |
| Accounts Excluded from Calculation of Deposit Franchise Bid Premium | Schedule 7 | 50 |

## EXHIBITS

| | | Page |
|---|---|---|
| Final Legal Notice | Exhibit 2.3A | 51 |
| Affidavit of Mailing | Exhibit 2.3B | 53 |
| Valuation of Certain Qualified Financial Contracts | Exhibit 3.2(c) | 54 |
| Interim Asset Servicing Arrangement | Exhibit 4.13 | 56 |
| Single Family Shared-Loss Agreement | Exhibit 4.15A | 60 |
| Commercial Shared-Loss Agreement | Exhibit 4.15B | 61 |

Module 1 – Whole Bank w/ Optional Shared Loss Agreements  
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT  
April 27, 2011

ii

Colorado Capital Bank  
Castle Rock, Colorado

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

## ALL DEPOSITS

THIS AGREEMENT, made and entered into as of the 8th day of July, 2011, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of COLORADO CAPITAL BANK, CASTLE ROCK, COLORADO** (the "Receiver"), **FIRST-CITIZENS BANK & TRUST COMPANY** organized under the laws of the State of North Carolina, and having its principal place of business in **RALEIGH, NORTH CAROLINA** (the "Assuming Institution"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

## RECITALS

A.  On the Bank Closing Date, the Chartering Authority closed **COLORADO CAPITAL BANK** (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof.

B.  The Assuming Institution desires to purchase certain assets and assume certain deposits and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement.

C.  Pursuant to 12 U.S.C. § 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Institution to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII.

D.  The Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Institution on the terms and subject to the conditions set forth in this Agreement.

E.  The Board has determined pursuant to 12 U.S.C. § 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

## AGREEMENT

**ARTICLE I.   GENERAL.**

**1.1.   Purpose.** The purpose of this Agreement is to set forth requirements regarding, among other things, the terms and conditions on which the Assuming Institution purchases certain assets and assumes certain liabilities of the Failed Bank.

**1.2.   Shared-Loss Agreements.** If the Receiver and the Assuming Institution desire to share losses and recoveries on certain acquired assets, a Shared-Loss Agreement or Shared-Loss

Agreements are attached hereto as Exhibit 4.15A and/or Exhibit 4.15B, as applicable, and will govern the terms of any such shared-loss arrangement. To the extent that any inconsistencies may arise between the terms of this Agreement and a Shared-Loss Agreement with respect to the subject matter of a Shared-Loss Agreement, the terms of the applicable Shared-Loss Agreement shall control.

 1.3. **Defined Terms**. Capitalized terms used in this Agreement shall have the meanings set forth or referenced in this Section 1.3. As used herein, words imparting the singular include the plural and vice versa.

 "**Acquired Subsidiary**" or "**Acquired Subsidiaries**" means one or more, as applicable, Subsidiaries of the Failed Bank acquired pursuant to Section 3.1.

 "**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in § 2(k) of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. § 1841.

 "**Agreement**" means this Purchase and Assumption Agreement by and among the Assuming Institution, the Corporation and the Receiver, as amended or otherwise modified from time to time.

 "**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition by virtue of being owned by such Subsidiaries.

 "**Assumed Deposits**" means Deposits.

 "**Assuming Institution**" has the meaning set forth in the introduction to this Agreement.

 "**Bank Closing Date**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

 "**Bank Premises**" means the banking buildings, drive-in banking facilities, teller facilities (staffed or automated), storage and service facilities, structures connecting remote facilities to banking houses, land on which the foregoing are located and unimproved land, together with any adjacent parking, that are owned or leased by the Failed Bank and that have formerly been utilized, are currently utilized, or are intended to be utilized in the future by the Failed Bank as shown on the Failed Bank Records as of the Bank Closing Date.

 "**Bid Amount**" has the meaning set forth in Article VII.

 "**Bid Valuation Date**" means May 4, 2011.

 "**Board**" has the meaning set forth in Recital D.

 "**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Failed Bank Records. The Book Value of any item shall be determined as of the Bank Closing Date after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of an Acquired

Module 1 – Whole Bank w/ Optional Shared Loss Agreements  2  Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT    Castle Rock, Colorado
April 27, 2011

Subsidiary shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of the Bank Closing Date, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of the Bank Closing Date, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of the Bank Closing Date, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income, fees or expenses, or general or specific reserves on the Failed Bank Records.

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. § 1821(c)(4), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. § 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of the Bank Closing Date, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Corporation**" has the meaning set forth in the introduction to this Agreement.

"**Counterclaim**" has the meaning set forth in Section 12.1(b).

"**Credit Documents**" means the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

"**Credit File**" means all Credit Documents and all other credit, collateral or insurance documents in the possession or custody of the Assuming Institution, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any such documents.

"Deposit" means a deposit as defined in 12 U.S.C. § 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of the Bank Closing Date.

"Deposit Secured Loan" means a loan in which the only collateral securing the loan is Assumed Deposits or deposits at other insured depository institutions.

"Electronically Stored Information" means any system backup tapes, any electronic mail (whether on an exchange or other similar system), any data on personal computers and any data on server hard drives.

"Eligible Individuals" has the meaning set forth in Section 4.12.

"ERISA" has the meaning set forth in Section 4.12.

"Failed Bank" has the meaning set forth in Recital A.

"Failed Bank Advances" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance and (iii) pay premiums for credit life insurance, accident and health insurance and vendor's single interest insurance.

"Failed Bank Records" means Records of the Failed Bank, including but not limited to, its corporate minutes, general ledger and subsidiary ledgers and schedules which support the general ledger balances.

"Fair Market Value" means:

(a) "Market Value" as defined in the regulation prescribing the standards for real estate appraisals used in federally related transactions, 12 C.F.R. § 323.2(g), and accordingly shall mean the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the assumed consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(i) Buyer and seller are typically motivated;

(ii) Both parties are well informed or well advised, and acting in what they consider their own best interests;

(iii) A reasonable time is allowed for exposure in the open market;

(iv) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

    (v) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale;

as determined as of the Bank Closing Date by an appraiser chosen by the Assuming Institution from a list of acceptable appraisers provided by the Receiver; any costs and fees associated with such determination shall be shared equally by the Receiver and the Assuming Institution, and

    with respect to Bank Premises (to the extent, if any, that Bank Premises are purchased utilizing this valuation method), shall be determined not later than sixty (60) days after the Bank Closing Date by an appraiser selected by the Receiver and the Assuming Institution within seven (7) days after the Bank Closing Date; or

    (b) with respect to property other than Bank Premises purchased utilizing this valuation method, the price therefor as established by the Receiver and agreed to by the Assuming Institution, or in the absence of such agreement, as determined in accordance with clause (a) above.

  "**FDIC Office Space**" has the meaning set forth in Section 4.11.

  "**Final Legal Notice**" has the meaning set forth in Section 2.3(a).

  "**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of the Bank Closing Date.

  "**Furniture and Equipment**" means the furniture and equipment (other than Safe Deposit Boxes, Personal Computers, Owned Data Management Equipment and motor vehicles), leased or owned by the Failed Bank and reflected on the Failed Bank Records as of the Bank Closing Date and located on or at Bank Premises, including without limitation automated teller machines, carpeting, furniture, office machinery, shelving, office supplies, telephone, surveillance and security systems, ancillary equipment and artwork. Furniture and equipment located at a storage facility not adjacent to a Bank Premises are excluded from this definition.

  "**GSE**" means a government sponsored enterprise.

  "**Indemnitees**" means, except as provided in Section 12.1(b)(xi), (i) the Assuming Institution, (ii) the Subsidiaries and Affiliates of the Assuming Institution other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Institution and (iii) the directors, officers, employees and agents of the Assuming Institution and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

  "**Information Package**" means the most recent compilation of financial and other data with respect to the Failed Bank, including any amendments or supplements thereto, provided to the Assuming Institution by the Corporation on the web site used by the Corporation to market the Failed Bank to potential acquirers.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements   5   Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT       Castle Rock, Colorado
April 27, 2011

"**Initial Payment**" means the payment made pursuant to Article VII (based on the best information available as of the Bank Closing Date), the amount of which shall be either (i) if the Bid Amount is positive, the aggregate Book Value of the Liabilities Assumed minus the sum of the aggregate purchase price of the Assets as determined pursuant to Section 3.2 and assets purchased and the positive Bid Amount, or (ii) if the Bid Amount is negative, the sum of the aggregate Book Value of the Liabilities Assumed and the negative Bid Amount minus the aggregate purchase price of the Assets and assets purchased. The Initial Payment shall be payable by the Corporation to the Assuming Institution if (i) the Liabilities Assumed are greater than the sum of the positive Bid Amount and the Assets and any other assets purchased, or if (ii) the sum of the Liabilities Assumed and the negative Bid Amount are greater than the Assets and assets purchased. The Initial Payment shall be payable by the Assuming Institution to the Corporation if (i) the Liabilities Assumed are less than the sum of the positive Bid Amount and the Assets and assets purchased, or if (ii) the sum of the Liabilities Assumed and the negative Bid Amount is less than the Assets and assets purchased. Such Initial Payment shall be subject to adjustment as provided in Article VIII.

"**Leased Data Management Equipment**" means any equipment, computer hardware, computer software (and the lease or licensing agreements related thereto), computer networking equipment, printers, fax machines, copiers, document scanners, data tape systems, data tapes, DVDs, CDs, flash drives, telecommunications and check processing equipment and any other electronic storage media leased by the Failed Bank at Bank Closing which is, was, or could have been used by the Failed Bank in connection with data management activities.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loan**" or "**Loans**" means, individually or collectively, all of the following owed to or held by the Failed Bank as of the Bank Closing Date:

    (a) loans (including loans which have been charged off the Failed Bank Records in whole or in part prior to and including the Bid Valuation Date), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans and lease financing contracts;

    (b) all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (a) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time

Module 1 – Whole Bank w/ Optional Shared Loss Agreements     6     Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT                Castle Rock, Colorado
April 27, 2011

and from time to time existing with respect to any of the obligations or instruments referred to in clause (a) above; and

(c) all amendments, modifications, renewals, extensions, refinancings and refundings of or for any of the foregoing.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly or severally.

"**Other Real Estate**" means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, easements, air rights and development rights that are owned by the Failed Bank.

"**Owned Data Management Equipment**" means any equipment, computer hardware, computer software (and the lease or licensing agreements related thereto), computer networking equipment, printers, fax machines, copiers, document scanners, data tape systems, data tapes, DVDs, CDs, flash drives, telecommunications and check processing equipment and any other electronic storage media owned by the Failed Bank at Bank Closing which is, was, or could have been used by the Failed Bank in connection with data management activities.

"**Payment Date**" means the first Business Day after the Bank Closing Date.

"**Person**" means any individual, corporation, partnership, joint venture, association, limited liability company, limited liability partnership, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Personal Computer(s)**" means computers based on a microprocessor generally designed to be used by one person at a time and which usually store informational data on that computer's internal hard drive or attached peripheral, and associated peripherals (such as keyboard, mouse, etc.). A personal computer can be found in various configurations such as laptops, net books, and desktops.

"**Primary Indemnitor**" means any Person (other than the Assuming Institution or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Pro Forma**" means a balance sheet that reflects a reasonably accurate financial statement of the Failed Bank through the Bank Closing Date and serves as a basis for the opening entries of both the Assuming Institution and the Receiver.

"**Put Date**" has the meaning set forth in Section 3.4(d).

"**Put Notice**" has the meaning set forth in Section 3.4(c).

"**Qualified Beneficiaries**" has the meaning set forth in Section 4.12.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. § 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm or Electronically Stored Information (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at the Bank Closing Date.

"**Receiver**" has the meaning set forth in the introduction to this Agreement.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Failed Bank Records as of the Bank Closing Date for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Institution, means the amount of such Related Liability as stated on the Failed Bank Records of the Assuming Institution (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one Asset, the amount of such Related Liability shall be allocated among such Assets for the purpose of determining the Related Liability Amount with respect to any one of such Assets.

Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such Assets stated on the Failed Bank Records of the entity that owns such Asset.

"**Repurchase Price**" means, with respect to any Asset, first taking the Book Value of the Asset at the Bank Closing Date and either subtracting the pro rata Asset discount or adding the pro rata Asset premium, and subsequently adjusting that amount (i) for any advances and interest on such Asset after the Bank Closing Date, (ii) by subtracting the total amount received by the Assuming Institution for such Asset after the Bank Closing Date, regardless of how applied and (iii) by adding total disbursements of principal made by the Receiver not otherwise included in the Book Value.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is three hundred sixty-five (365) days after the Bank Closing Date, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Institution. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the investment rate on twenty-six (26)-week United States Treasury Bills as published on the Bank Closing Date by the United States Treasury on the TreasuryDirect.gov website; provided, that if no such Investment Rate is published the week of the Bank Closing Date, the investment rate for such Treasury Bills

most recently published by the United States Treasury on TreasuryDirect.gov prior to the Bank Closing Date shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the Investment Rate on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published by the United States Treasury on the TreasuryDirect.gov website.

"**Shared-Loss Agreements**" means, if any, the Single Family Shared-Loss Agreement attached hereto as Exhibit 4.15A and, if any, the Commercial Shared-Loss Agreement, attached hereto as Exhibit 4.15B.

"**Subsidiary**" has the meaning set forth in § 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. § 1813(w)(4), as amended.

### ARTICLE II.  ASSUMPTION OF LIABILITIES.

**2.1.  Liabilities Assumed by Assuming Institution.** The Assuming Institution expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform and discharge, all of the following liabilities of the Failed Bank as of the Bank Closing Date, except as otherwise provided in this Agreement (such liabilities referred to as "**Liabilities Assumed**"):

(a) Assumed Deposits, except those Deposits specifically listed on Schedule 2.1(a); provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Institution agrees to properly secure such Deposits with such Assets as appropriate which, prior to the Bank Closing Date, were pledged as security by the Failed Bank, or with assets of the Assuming Institution, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b) liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the amount of any liability assumed pursuant to this Section 2.1(b) shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c) all borrowings from, and obligations and indebtedness to, Federal Reserve Banks and Federal Home Loan Banks, if any, whether currently owed, or conditional or not yet matured, including but not limited to, if applicable, (i) advances, including principal, interest, and any prepayment fees, costs and expenses; (ii) letters of credit, including any reimbursement obligations; (iii) acquired member assets programs, including representations, warranties, credit enhancement obligations and servicing obligations; (iv) affordable housing programs, including retention agreements and other contracts and monitoring obligations; (v) swaps and other derivatives; and (vi) safekeeping and custody agreements, provided, that the assumption of any liability pursuant to this Section 2.1(c) shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after the Bank Closing Date, if any;

(d) ad valorem taxes applicable to any Asset, if any; provided, that the assumption of any ad valorem taxes pursuant to this Section 2.1(d) shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)  liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including the Bank Closing Date); provided, that the assumption of any liability pursuant to this Section 2.1(e) shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)  United States Treasury tax and loan note option accounts, if any;

(g)  liabilities for any acceptance or commercial letter of credit provided, that the assumption of any liability pursuant to this Section 2.1(g) shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)  liabilities for any "standby letters of credit" as defined in 12 C.F.R. § 337.2(a) issued on the behalf of any Obligor of a Loan acquired hereunder by the Assuming Institution, but excluding any other standby letters of credit;

(i)  duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's Records, credit card business, debit card business, stored value and gift card business, overdraft protection plans, safe deposit business, safekeeping business and trust business, if any;

(j)  liabilities, if any, for Commitments;

(k)  liabilities, if any, for amounts owed to any Acquired Subsidiary;

(l)  liabilities, if any, with respect to Qualified Financial Contracts;

(m)  duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or any contract pursuant to which mortgage servicing is provided to the Failed Bank by others, including (i) any seller obligations, seller origination and repurchase obligations, and (ii) any GSE seller or servicer obligations, provided that, if the Assuming Institution is not an approved GSE servicer, or does not intend or is unable to become an approved GSE servicer, the Assuming Institution will cooperate with the Receiver and the GSE to effect the transfer of any such servicing obligations to a GSE-approved servicer; and

(n)  all asset-related offensive litigation liabilities and all asset-related defensive litigation liabilities, but only to the extent such liabilities relate to assets subject to a Shared-Loss Agreement, and provided that all other defensive litigation and any class actions with respect to credit card business are retained by the Receiver.

2.2.  **Interest on Deposit Liabilities.**  The Assuming Institution agrees that, from and after the Bank Closing Date, it will accrue and pay interest on Assumed Deposits pursuant to Section 2.1 at a rate(s) it shall determine; provided, that for non-transaction Deposit liabilities such rate(s) shall not be less than the lowest rate offered by the Assuming Institution to its depositors for non-transaction deposit accounts. The Assuming Institution shall permit each depositor to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Deposit, whether or not the Assuming Institution elects to pay interest in accordance with any deposit agreement formerly existing between the Failed Bank and such depositor; and further provided, that if such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such

pledge. The Assuming Institution shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay and of such withdrawal rights.

2.3. <u>Unclaimed Deposits</u>.

(a) <u>Final Legal Notice</u>. Fifteen (15) months following the Bank Closing Date, the Assuming Institution will provide the Receiver a listing of all deposit accounts, including the type of account, not claimed by the depositor. The Receiver will review the list and authorize the Assuming Institution to act on behalf of the Receiver to send a Final Legal Notice in a form substantially similar to <u>Exhibit 2.3A</u> (the "Final Legal Notice") to the owner(s) of the unclaimed deposits reminding them of the need to claim or arrange to continue their account(s) with the Assuming Institution. The Assuming Institution will send the Final Legal Notice to the depositors within thirty (30) days following notification of the Receiver's authorization. The Assuming Institution will prepare an Affidavit of Mailing in a form substantially similar to <u>Exhibit 2.3B</u> and will forward the Affidavit of Mailing to the Receiver after mailing out the Final Legal Notice to the owner(s) of unclaimed deposit accounts.

(b) <u>Unclaimed Deposits</u>. If, within eighteen (18) months after the Bank Closing Date, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Assumed Deposits at the Assuming Institution, the Assuming Institution shall, within fifteen (15) Business Days after the end of such eighteen (18) month period, (i) refund to the Receiver the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Receiver a schedule of all such refunded Deposits in such form as may be prescribed by the Receiver, and (iii) assign, transfer, convey, and deliver to the Receiver, all right, title and interest of the Assuming Institution in and to the Records previously transferred to the Assuming Institution and other records generated or maintained by the Assuming Institution pertaining to such Deposits. During such eighteen (18) month period, at the request of the Receiver, the Assuming Institution promptly shall provide to the Receiver schedules of unclaimed Deposits in such form as may be prescribed by the Receiver.

2.4. <u>Employee Plans</u>. Except as provided in Section 4.12, the Assuming Institution shall have no liabilities, obligations or responsibilities under the Failed Bank's health care, bonus, vacation, pension, profit sharing, deferred compensation, 401k or stock purchase plans or similar plans, if any, unless the Receiver and the Assuming Institution agree otherwise subsequent to the date of this Agreement.

### ARTICLE III. PURCHASE OF ASSETS.

3.1. <u>Assets Purchased by Assuming Institution</u>. With the exception of certain assets expressly excluded in Sections 3.5 and 3.6 and, if applicable, listed on Schedule 3.5(l) the Assuming Institution hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys and delivers to the Assuming Institution, all right, title and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of the Bank Closing Date. Assets are purchased hereunder by the Assuming Institution subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.

3.2. <u>Asset Purchase Price</u>.

(a) <u>Determination of Asset Purchase Price</u>. All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Institution shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on <u>Schedule 3.2</u>, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on <u>Schedule 3.2</u> or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off on the Failed Bank Records before the Bid Valuation Date shall be purchased at a price of zero. The purchase price for Acquired Subsidiaries shall be adjusted pursuant to Section 4.6(i)(iv), if applicable.

(b) <u>Purchase Price for Securities</u>. The purchase price for securities (other than the capital stock of any Acquired Subsidiary and Federal Home Loan Bank stock) purchased under Section 3.1 by the Assuming Institution shall be the market value thereof as of the Bank Closing Date, which market value shall be (i) the market price for each such security quoted at the close of the trading day effective on the Bank Closing Date as published electronically by Bloomberg, L.P., or alternatively, at the discretion of the Receiver, IDC/Financial Times (FT) Interactive Data; (ii) provided that if such market price is not available for any such security, the Assuming Institution will submit a bid for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Institution and the Receiver) and the Receiver, in its sole and absolute discretion, will accept or reject each such bid; and (iii) further provided that in the absence of an acceptable bid from the Assuming Institution, each such security shall not pass to the Assuming Institution and shall be deemed to be an excluded asset hereunder and listed on <u>Schedule 3.5(l)</u>.

(c) <u>Purchase Price for Qualified Financial Contracts</u>. Qualified Financial Contracts shall be purchased at market value determined in accordance with the terms of <u>Exhibit 3.2(c)</u>. Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Institution.

3.3. <u>Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.</u> THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING INSTITUTION UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, VALUE, COLLECTIBILITY, GENUINENESS, ENFORCEABILITY, DOCUMENTATION, CONDITION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

3.4. <u>Puts of Assets to the Receiver</u>.

(a) <u>Puts Within 30 Days After the Bank Closing Date</u>. During the thirty (30)-day period following the Bank Closing Date and only during such period (which thirty (30)-day period may be extended in writing in the sole and absolute discretion of the Receiver for any Loan), in accordance with this Section 3.4, the Assuming Institution shall be entitled to require the Receiver to purchase any Deposit Secured Loan transferred to the Assuming Institution