# EXHIBIT A-PART 4

## SCHEDULE 2.1(a)

## EXCLUDED DEPOSIT LIABILITY ACCOUNTS

Colorado Capital Bank has deposits associated with the Depository Organization (DO) Cede & Co as Nominee for DTC. The DO accounts do not pass to the Assuming Bank and are excluded from the transaction as described in section 2.1 of the P&A Agreement. The DO Detail Report identifies four DO accounts with a balance of $30,685,000 as of May 4, 2011. This schedule will be updated post closing with data as of Bank Closing Date.

## SCHEDULE 3.2

## PURCHASE PRICE OF ASSETS OR ANY OTHER ASSETS

| | | |
|---|---|---|
| (a) | cash and receivables from depository institutions, including cash items in the process of collection, plus interest thereon: | Book Value |
| (b) | securities (exclusive of the capital stock of Acquired Subsidiaries and FHLB stock), plus interest thereon: | As provided in Section 3.2(b) |
| (c) | federal funds sold and repurchase agreements, if any, including interest thereon: | Book Value |
| (d) | Loans: | Book Value |
| (e) | credit card business: | Book Value |
| (f) | Safe Deposit Boxes and related business, safekeeping business and trust business, if any: | Book Value |
| (g) | Records and other documents: | Book Value |
| (h) | Other Real Estate: | Book Value |
| (i) | boats, motor vehicles, aircraft, trailers, fire arms, and repossessed collateral | Book Value |
| (j) | capital stock of any Acquired Subsidiaries (subject to Section 3.2(b), and FHLB stock: | Book Value |
| (k) | amounts owed to the Failed Bank by any Acquired Subsidiaries: | Book Value |
| (l) | assets securing Deposits of public money, to the extent not otherwise purchased hereunder: | Book Value |
| (m) | overdrafts of customers: | Book Value |
| (n) | rights, if any, with respect to Qualified Financial Contracts: | As provided in Section 3.2(c) |

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

45

Colorado Capital Bank
Castle Rock, Colorado

| | | |
|---|---|---|
| (o) | rights of the Failed Bank to have mortgage servicing provided to the Failed Bank by others and related contracts: | Book Value |
| (q) | Personal Computers and Owned Data Management Equipment: | Fair Market Value |

Assets subject to an option to purchase:

| | | |
|---|---|---|
| (a) | Bank Premises: | Fair Market Value |
| (b) | Furniture and Equipment: | Fair Market Value |
| (c) | Fixtures: | Fair Market Value |
| (d) | Other Equipment: | Fair Market Value |

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

46

Colorado Capital Bank
Castle Rock, Colorado

## SCHEDULE 3.5(l)

## EXCLUDED SECURITIES

| CUSIP | ASSET NAME/DESCRIPTION | ORIGINAL FACE/PAR |
|---|---|---|
| | | |
| | | $ 2,655,000.00 |

## SCHEDULE 6.3

## DATA RETENTION CATALOG





Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1– PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

49

Colorado Capital Bank
Castle Rock, Colorado

## SCHEDULE 7
## Accounts Excluded from Calculation of Deposit Franchise Bid Premium

### Colorado Capital Bank
### Castle Rock, CO

The accounts identified below will pass to the Assuming Bank (unless otherwise noted). When calculating the premium to be paid on Assumed Deposits in a P&A transaction, the FDIC will exclude the following categories of deposit accounts:



| Category | Description | Amount |
|---|---|---|
| I | Non-DO Brokered Deposits | $23,754,423 |
| II | CDARS | $14,772,106 |
| III | Market Place Deposits | $376,865,592 |
| | Total deposits excluded from calculation of premium | $415,392,121 |

## Category Description

**I Brokered Deposits**
Brokered deposit accounts are accounts for which the "depositor of record" is an agent, nominee, or custodian who deposits funds for a principal or principals to whom "pass-through" deposit insurance coverage may be extended. The FDIC separates brokered deposit accounts into 2 categories: 1) Depository Organization (DO) Brokered Deposits and 2) Non-Depository Organization (Non-DO) Brokered Deposits. This distinction is made by the FDIC to facilitate our role as Receiver and Insurer. These terms will not appear on other "brokered deposit" reports generated by the institution.

Non-DO Brokered Deposits pass to the Assuming Bank, but are excluded from Assumed Deposits when the deposit premium is calculated.

DO Brokered Deposits (Cede & Co as Nominee for DTC), are typically excluded from Assumed Deposits in the P&A transaction. A list of these accounts is provided on "Schedule 2.1 DO Brokered Deposit Detail Report". If, however, the terms of a particular transaction are altered and the DO Brokered Deposits pass to the Assuming Bank, they will not be included in Assumed Deposits for purposes of calculating the deposit premium.

**II CDARS**
CDARS deposits pass to the Assuming Bank, but are excluded from Assumed Deposits when the deposit premium is calculated.

Colorado Capital Bank did participate in the CDARS program as of the date of the deposit download. If CDARS deposits are taken between the date of the deposit download and the Bank Closing Date, they will be identified post closing and made part of Schedule 7 to the P&A Agreement.

**III Market Place Deposits**
"Market Place Deposits" is a description given to deposits that may have been solicited via a money desk, internet subscription service (for example, Qwickrate), or similar programs.

This schedule provides a snapshot of account categories and balances as of May 4, 2011, which is the date of the deposit download. The deposit franchise bid premium will be calculated using account categories and balances as of Bank Closing Date that are reflected in the general ledger or subsystem as described above. The final numbers for Schedule 7 will be provided post closing.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

50

Colorado Capital Bank
Castle Rock, Colorado

## EXHIBIT 2.3A

FINAL LEGAL NOTICE
Claiming Requirements for Deposits
Under 12 U.S.C. 1822(e)

[Date]

[Name of Unclaimed Depositor]
[Address of Unclaimed Depositor]
[Anytown, USA]

Subject: [XXXXX – Name of Bank
City, State] – In Receivership

Dear [Sir/Madam]:

      As you may know, on [Date: Closing Date], the [Name of Bank ("The Bank")] was closed and the Federal Deposit Insurance Corporation ("FDIC") transferred [The Bank's] accounts to [Name of Acquiring Institution].

      According to federal law under 12 U.S.C., 1822(e), on [Date: eighteen months from the Closing Date], [Name of Acquiring Institution] must transfer the funds in your account(s) back to the FDIC if you have not claimed your account(s) with [Name of Acquiring Institution]. Based on the records recently supplied to us by [Name of Acquiring Institution], your account(s) currently fall into this category.

      This letter is your formal Legal Notice that you have until [Date: eighteen months from the Closing Date], to claim or arrange to continue your account(s) with [Name of Acquiring Institution]. There are several ways that you can claim your account(s) at [Name of Acquiring Institution]. It is only necessary for you to take any one of the following actions in order for your account(s) at [Name of Acquiring Institution] to be deemed claimed. In addition, if you have more than one account, your claim to one account will automatically claim all accounts:

1. Write to [Name of Acquiring Institution] and notify them that you wish to keep your account(s) active with them. Please be sure to include the name of the account(s), the account number(s), the signature of an authorized signer on the account(s), name, and address. [Name of Acquiring Institution] address is:

    [123 Main Street
    Anytown, USA]

2. Execute a new signature card on your account(s), enter into a new deposit agreement with [Name of Acquiring Institution], change the ownership on your account(s), or renegotiate the terms of your certificate of deposit account(s) (if any).

3. Provide [Name of Acquiring Institution] with a change of address form.

4. Make a deposit to or withdrawal from your account(s). This includes writing a check on any account or having an automatic direct deposit credited to or an automatic withdrawal debited from an account.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements    51    Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT           Castle Rock, Colorado
April 27, 2011

If you do not want to continue your account(s) with [Name of Acquiring Institution] for any reason, you can withdraw your funds and close your account(s). Withdrawing funds from one or more of your account(s) satisfies the federal law claiming requirement. If you have time deposits, such as certificates of deposit, [Name of Acquiring Institution] can advise you how to withdraw them without being charged an interest penalty for early withdrawal.

If you do not claim ownership of your account(s) at [Name of Acquiring Institution by Date: eighteen months from the Closing Date] federal law requires [Name of Acquiring Institution] to return your deposits to the FDIC, which will deliver them as unclaimed property to the State indicated in your address in the Failed Institution's records. If your address is outside of the United States, the FDIC will deliver the deposits to the State in which the Failed Institution had its main office. 12 U.S.C. § 1822(e). If the State accepts custody of your deposits, you will have 10 years from the date of delivery to claim your deposits from the State. After 10 years you will be permanently barred from claiming your deposits. However, if the State refuses to take custody of your deposits, you will be able to claim them from the FDIC until the receivership is terminated. If you have not claimed your insured deposits before the receivership is terminated, and a receivership may be terminated at any time, all of your rights in those deposits will be barred.

If you have any questions or concerns about these items, please contact [Bank Employee] at [Name of Acquiring Institution] by phone at [(XXX) XXX-XXXX].

        Sincerely,

        [Name of Claims Specialist]
        [Title]

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

52

Colorado Capital Bank
Castle Rock, Colorado

## EXHIBIT 2.3B

## AFFIDAVIT OF MAILING

AFFIDAVIT OF MAILING

State of

COUNTY OF

I am employed as a [Title of Office] by the [Name of Acquiring Institution].

This will attest that on [Date of mailing], I caused a true and correct copy of the Final Legal Notice, attached hereto, to owners of unclaimed deposits of [Name of Failed Bank], City, State, to be prepared for deposit in the mail of the United States of America on behalf of the Federal Deposit Insurance Corporation. A list of depositors to whom the notice was mailed is attached. This notice was mailed to the depositor's last address as reflected on the books and records of the [Name of Failed Bank] as of the date of failure.

```
[Name]
[Title of Office]
[Name of Acquiring Institution]
```

Subscribed and sworn to before me this _____ day of [Month, Year].

My commission expires:

_____        _____
                                      [Name], Notary Public

## EXHIBIT 3.2(c)

## VALUATION OF CERTAIN

## QUALIFIED FINANCIAL CONTRACTS

A. Scope

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

B. Exclusions

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Institution but are not subject to adjustment from Book Value.

C. Adjustment

The difference between the Book Value and market value as of the Bank Closing Date.

D. Methodology

1. The price at which the Assuming Institution sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Institution and the Receiver.

2. In valuing all other Qualified Financial Contracts, the following principles will apply:

    (i) All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

    (ii) All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

    (iii) Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1– PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

54

Colorado Capital Bank
Castle Rock, Colorado

    (iv)    For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

    (v)    For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Institution as of the Bank Closing Date. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Institution will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements  
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT  
April 27, 2011

55

Colorado Capital Bank  
Castle Rock, Colorado

## EXHIBIT 4.13

## INTERIM ASSET SERVICING ARRANGEMENT

This Interim Asset Servicing Arrangement is made pursuant to and as of the date of that certain Purchase and Assumption Agreement (the "**Purchase and Assumption Agreement**") among the Receiver, the Assuming Institution and the Corporation, to which this Arrangement is attached. Capitalized terms used and not otherwise defined in this Exhibit 4.13 shall have the meanings assigned to such terms in the Agreement.

(a) With respect to each asset or liability designated from time to time by the Receiver to be serviced by the Assuming Institution pursuant to this Interim Asset Servicing Arrangement (the "**Arrangement**"), including any assets or liabilities sold or conveyed by the Receiver to any party other than the Assuming Institution (any such party, a "**Successor Owner**") but with respect to which the Receiver has an obligation to service or provide servicing support (such assets and liabilities, the "**Pool Assets**"), during the term of this Arrangement the Assuming Institution shall, with respect to the Pool Assets:

(i) promptly post and apply payments received to the applicable system of record;

(ii) reverse and return insufficient funds checks;

(iii) pay (A) participation payments to participants in Loans, as and when received; (B) tax and insurance bills, as they come due, out of any escrow funds maintained for such purposes; and (C) unfunded commitments and protective advances out of any escrow funds created for such purposes;

(iv) process funding draws under Loans and protective advances in connection with collateral and acquired property, in each case, as and to the extent authorized and funded by the Receiver;

(v) maintain in use all data processing equipment and systems and other systems of record on which any activity with respect to any Pool Assets are, or prior to the Bank Closing Date, were, recorded, and maintain all historical data on any such systems as of the Bank Closing Date and not, without the express consent of the Receiver (which consent must be sought at least sixty (60) days prior to taking any action), deconvert, remove, transfer or otherwise discontinue use of any of the Failed Bank's systems of record with respect to any Pool Asset;

(vi) maintain accurate records reflecting (A) payments received by the Assuming Institution, (B) information received by the Assuming Institution concerning changes in the address or identity of any Obligor and (C) other servicing actions taken by the Assuming Institution, including checks returned for insufficient funds;

(vii) send (A) billing statements to Obligors on Pool Assets (to the extent that such statements were sent by the Failed Bank or as are requested by the Receiver) and (B)

notices to Obligors who are in default on Loans (in the same manner as the Failed Bank or as are requested by the Receiver);

 (viii) employ a sufficient number of qualified employees to provide the services required to be provided by the Assuming Institution pursuant to this Arrangement (with the number and qualifications of such employees to be not less than the number and qualifications of employees employed by the Failed Bank to perform such functions as of the Bank Closing Date);

 (ix) hold in trust any Credit Files and any servicing files in the possession or on the premises of the Assuming Institution for the Receiver or the Successor Owner (as applicable) and segregate from the other books and records of the Assuming Institution and appropriately mark such Credit Files and servicing files to clearly reflect the ownership interest of the Receiver or the successor owner (as applicable);

 (x) send to the Receiver (indicating closed bank name and number), Attn: Interim Servicing Manager, at the email address provided in Section 13.6 of the Purchase and Assumption Agreement, or to such other person at such address as the Receiver may designate, via overnight delivery: (A) on a weekly basis, weekly reports, including, without limitation, reports reflecting collections and trial balances, and (B) any other reports, copies or information as may be requested from time to time by the Receiver, including, if requested, copies of (1) checks or other remittances received, (2) insufficient funds checks returned, (3) checks or other remittances for payment to participants or for taxes, insurance, funding advances and protective advances, (4) pay-off requests, and (5) notices to defaulted Obligors;

 (xi) remit on a weekly basis to the Receiver (indicating closed bank name and number), Attn: DRR Cashier Unit, Business Operations Support Branch, in the same manner as provided in paragraph (a)(x), via wire transfer to the account designated by the Receiver, or to such other person at such other address and/or account as the Receiver may designate, all payments received;

 (xii) prepare and timely file all information reports with appropriate tax authorities, and, if requested by the Receiver, prepare and file tax returns and remit taxes due on or before the due date;

 (xiii) provide and furnish such other services, operations or functions, including, without limitation, with regard to any business, enterprise or agreement which is a Pool Asset, as may be requested by the Receiver;

 (xiv) establish a custodial account for the Receiver and for each successor owner at the Assuming Institution, each of which shall be interest bearing, titled in the name of Assuming Institution, in trust for the Receiver or the successor owner (as applicable), in each case as the owner, and segregate and hold all funds collected and received with respect to the Pool Assets separate and apart from any of the Assuming Institution's own funds and general assets; and

 (xv) no later than the end of the second Business Day following receipt thereof, deposit into the applicable custodial account and retain therein all funds collected and received with respect to the Pool Assets.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements  57  Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT    Castle Rock, Colorado
April 27, 2011

Notwithstanding anything to the contrary in this Exhibit, the Assuming Institution shall not be required to initiate litigation or other collection proceedings against any Obligor or any collateral with respect to any defaulted Loan. The Assuming Institution shall promptly notify the Receiver, at the address referred to above in paragraph (a)(x), of any claims or legal actions regarding any Pool Asset.

(b) In consideration for the provision of the services provided pursuant to this Arrangement, the Receiver agrees to reimburse the Assuming Institution for actual, reasonable and necessary expenses incurred in connection with the performance of its duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, data processing and amounts paid for employee services (based upon the number of hours spent performing servicing duties).

(c) The Assuming Institution shall provide the services described herein for a term of up to three hundred sixty-five (365) days after the Bank Closing Date. The Receiver may terminate the Arrangement at any time upon not less than sixty (60) days notice to the Assuming Institution without any liability or cost to the Receiver other than the fees and expenses due to the Assuming Institution as of the termination date pursuant to paragraph (b) above.

(d) At any time during the term of this Arrangement, the Receiver may, upon not less than thirty (30) days prior written notice to the Assuming Institution, remove one or more Pool Assets, and at the time of such removal the Assuming Institution's responsibility with respect thereto shall terminate.

(e) At the expiration of this Arrangement or upon the termination of the Assuming Institution's responsibility with respect to any Pool Asset pursuant to paragraph (d) hereof, the Assuming Institution shall:

    (i) deliver to the Receiver (or its designee) all of the Credit Documents and records relating to the Pool Assets; and

    (ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver or its designees (including, without limitation, its contractors and persons to which any Pool Assets are conveyed).

(f) At the request of the Receiver, the Assuming Institution shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver and providing to the Receiver and its designees (including, without limitation, its contractors and any actual or potential successor owners) (i) information and data regarding the Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool Assets to another system or systems and to facilitate due diligence by actual and potential successor owners, and (ii) access to employees of the Assuming Institution involved in the management of, or otherwise familiar with, the Pool Assets.

(g) Until such time as the Arrangement expires or is terminated, without limitation of its obligations set forth above or in the Purchase and Assumption Agreement and without any

Module I – Whole Bank w/ Optional Shared Loss Agreements     58     Colorado Capital Bank
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT     Castle Rock, Colorado
April 27, 2011


additional consideration (other than that set forth in paragraph (b) above), the Assuming Institution shall provide the Receiver and its designees (including, without limitation, its contractors and actual and potential successor owners) with the following, as the same may be requested:

    (i) access to and the ability to obtain assistance and information from personnel of the Assuming Institution, including former personnel of the Failed Bank and personnel of third party consultants;

    (ii) access to and the ability to use and download information from data processing systems and other systems of record on which information regarding Pool Assets or any assets transferred to or liabilities assumed by the Assuming Institution is stored or maintained (regardless of whether information with respect to other assets or liabilities is also stored or maintained thereon); and

    (iii) access to and the ability to use and occupy office space (including parking facilities and vault space), facilities, utilities (including local telephone service and facsimile machines), furniture, equipment (including photocopying and facsimile machines), and technology and connectivity (including email accounts, network access and technology resources such as shared drives) in the Bank Premises occupied by the Assuming Institution.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – PURCHASE AND ASSUMPTION AGREEMENT
April 27, 2011

59

Colorado Capital Bank
Castle Rock, Colorado