# EXHIBIT 4.15B
## COMMERCIAL SHARED-LOSS AGREEMENT

### TABLE OF CONTENTS

**ARTICLE 1.  GENERAL** ...................................... 1

1.1  Purpose ................................................ 1
1.2  Relationship with Purchase and Assumption Agreement .............................................. 1
1.3  Defined Terms ...................................... 1

**ARTICLE 2.  SHARED-LOSS ARRANGEMENT** ...... 1

2.1  Accounting for and Management of Shared-Loss Assets ................................................... 1
2.2  Payments with Respect to Shared-Loss Assets ........ 2
2.3  Payments Applicable to Shared-Loss Quarters ........ 2
2.4  Payments Applicable to Recovery Quarters ............ 3
2.5  True-Up Payment and Calculation ...................... 3
2.6  Limitation on Payments ................................ 4
2.7  Expenses .............................................. 5
2.8  Permitted Advances and Amendments ................ 8
2.9  Recovery .............................................. 9
2.10  Treatment as a Shared-Loss Asset ................... 12
2.11  Receiver's Option to Purchase ...................... 13

**ARTICLE 3.  ADMINISTRATION OF SHARED-LOSS ASSETS** ................................................ 14

3.1  Management Standards Regarding Administration 14
3.2  Assuming Institution's Responsibilities and Duties 14
3.3  Third Party Servicers and Affiliates ................ 15
3.4  Utilization by the Assuming Institution of Special Receivership Powers ................................ 16
3.5  Tax Ruling ........................................... 17

**ARTICLE 4  SALE OF CERTAIN SHARED-LOSS ASSETS** .................................................. 17

4.1  Sales of Shared-Loss Assets ......................... 17
4.2  Calculation of Gain or Loss on Sale ................. 17
4.3  Sale of ORE, Additional ORE or Subsidiary ORE. 18

**ARTICLE 5.  CERTIFICATES, REPORTS AND RECORDS** .............................................. 18

5.1  Reporting Obligations of the Assuming Institution 18
5.2  Quarterly Certificates .............................. 18
5.3  Notification of Certain Transactions ................ 19
5.4  Notification of Related Loans....................... 20
5.5  Auditor's Report; Right to Audit .................... 20

5.6  Accounting Principles ............................... 21
5.7  Records and Reports ................................. 21

**ARTICLE 6.  MISCELLANEOUS** ...................... 22

6.1  Expenses ............................................. 22
6.2  Successors and Assigns .............................. 22
6.3  Waiver of Jury Trial ................................ 23
6.4  No Third Party Beneficiary ......................... 23
6.5  Consent; Determination of Discretion................ 23
6.6  Rights Cumulative ................................... 23
6.7  References ........................................... 23
6.8  Notice ............................................... 23

**ARTICLE 7.  DISPUTE RESOLUTION** ................ 24

7.1  Methods of Resolution .............................. 24
7.2  Informal Resolution ................................. 24
7.3  Resolution by Non-Binding Dispute Resolution Proceeding........................................... 24
7.4  Confidentiality of Compromise Negotiations......... 25
7.5  Payment Resulting from Compromise Negotiations ........................................ 25
7.6  Formal Resolution ................................... 25
7.7  Limitation on FDIC Party ........................... 26
7.8  Effectiveness of Agreement Pending Dispute ........ 26
7.9  Governing Rules and Law ........................... 26
7.10  Review Board Proceedings ......................... 26
7.11  Impartiality ........................................ 28
7.12  Schedule ........................................... 28
7.13  Written Award ...................................... 28
7.14  Interest Rate on Award ............................. 28
7.15  Payments ........................................... 29
7.16  Fees, Costs and Expenses........................... 29
7.17  Binding and Conclusive Nature..................... 29
7.18  No Precedent ....................................... 29
7.19  Confidentiality; Proceedings, Information and Documents........................................... 29
7.20  Confidentiality of Arbitration Award................ 30
7.21  Extension of Time Periods ......................... 30
7.22  Venue .............................................. 30

**ARTICLE 8.  DEFINITIONS** ........................... 30

**Exhibit A**

# EXHIBITS

|  |  | Page |
|---|---|---|
| True-Up | Exhibit 2.5 | 38 |
| Exclusion from Reimbursable Expenses | Exhibit 2.7 | 39 |
| Interest Income as a Recovery | Exhibit 2.9 | 40 |
| Form of Quarterly Certificates | Exhibit 5.2 | 41 |

# SCHEDULES

|  |  | Page |
|---|---|---|
| Loans Subject to Loss-Sharing under the Commercial Shared-Loss Agreement | Schedule 4.15B | 45 |
| Shared-Loss Subsidiaries | Schedule 4.15D | 46 |

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-ii

Colorado Capital Bank
City, State

**EXHIBIT 4.15B**

## COMMERCIAL SHARED-LOSS AGREEMENT

A.     This Commercial Shared-Loss Agreement and the Exhibits attached hereto and incorporated herein by this reference (collectively, the "**Agreement**") is made pursuant to and as of the date of that certain Purchase and Assumption Agreement (the "**Purchase and Assumption Agreement**") among the Receiver, the Assuming Institution and the Corporation, to which this Agreement is attached.

B.     This Agreement shall apply only if the Assuming Institution has purchased Shared-Loss Assets (as defined herein) pursuant to the Purchase and Assumption Agreement.  Subject to the provisions of this Agreement, it is the intention of the parties that the Receiver and the Assuming Institution shall share certain losses, expenses and Recoveries (as defined herein).

## A G R E E M E N T

**ARTICLE 1.     GENERAL.**

**1.1.     Purpose**.  The purpose of this Agreement is to set forth requirements regarding, among other things, management of Shared-Loss Assets by the Assuming Institution and procedures for notices, consents, reporting and payments. In administering the Shared-Loss Assets, the Assuming Institution shall at all times comply with the Management Standards set forth in Article 3.

**1.2.     Relationship with Purchase and Assumption Agreement**.  To the extent that any inconsistencies may arise between the terms of the Purchase and Assumption Agreement and this Agreement with respect to the subject matter of this Agreement, the terms of this Agreement shall control.

**1.3.     Defined Terms**.  The capitalized terms used in this Agreement have the meanings defined or referenced in Article 8.

**ARTICLE 2.     SHARED-LOSS ARRANGEMENT.**

**2.1.     Accounting for and Management of Shared-Loss Assets**.

(a)     _Initial Values_.  The Assuming Institution shall record the Shared-Loss Assets on its Accounting Records at their respective Book Values as of the Commencement Date.

(b)     _Adjustments_.  After the Commencement Date, the Assuming Institution shall adjust the Book Values of the Shared-Loss Assets in accordance with this Agreement, the Examination Criteria and Article VIII of the Purchase and Assumption Agreement.

(c)     _Management_.  The Assuming Institution shall manage and account for the Shared-Loss Assets in accordance with this Agreement.

(d)     _Loss Mitigation_. Within 90 days of bank closing, the Assuming Institution shall submit to the FDIC for approval a written loss mitigation plan.  The loss mitigation plan

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-1

Colorado Capital Bank
City, State

shall be updated annually and submitted to FDIC.  On a quarterly basis the Assuming Institution shall deliver to the FDIC the internal management reports utilized to monitor the status of loan restructurings in process for assets on Schedule 4.15B as well as assets that have successfully undergone documented loan restructurings.

**2.2.**   **Payments with Respect to Shared-Loss Assets**.

(a)   Calculation and Method of Payments.   Subject to the conditions of this Agreement, the parties shall make the payments set forth in this Article 2.  All payments made by a party under this Agreement shall be made by wire transfer.

(b)   Timing of Payments.

(i)   Payments by the Receiver under this Article 2 shall be made within thirty (30) days following the date on which the Receiver receives the Quarterly Certificate with respect to each Shared-Loss Quarter or Recovery Quarter, provided that the Quarterly Certificate is complete, accurate, timely and in compliance with the requirements of this Agreement.

(ii)   Payments by the Assuming Institution under this Article 2 shall be made on or before the due date for the Quarterly Certificate for each Shared-Loss Quarter or Recovery Quarter, as applicable.

(c)   Source of Receiver's Funds.   Payment obligations of the Receiver with respect to this Agreement shall be treated as administrative expenses of the Receiver pursuant to 12 U.S.C § 1821(d)(11).   To the extent that the Receiver requires funds to make payments relating to Shared-Loss Assets pursuant to this Agreement, the Receiver shall request funds under the Master Loan and Security Agreement between the FDIC in its corporate capacity and the FDIC in its receivership capacity, with respect to any receivership, dated as of May 21, 2009, as amended.

(d)   Shared-Loss Subsidiaries.   Covered Losses with respect to Subsidiary Shared-Loss Loans and Subsidiary ORE shall not exceed the Applicable Percentage of the Investment in Subsidiary of each Shared-Loss Subsidiary, if any, identified on Schedule 4.15D as the owner of each such Subsidiary Shared-Loss Loans or Subsidiary ORE.

**2.3.**   **Payments Applicable to Shared-Loss Quarters**.   For each Shared-Loss Quarter, pursuant to the applicable Quarterly Certificate, one of the payments described at (a) or (b) below shall be made, as appropriate, with respect to Shared-Loss Assets:

(a)   Covered Loss Payments by the Receiver.   The Receiver shall pay to the Assuming Institution the "**Covered Loss**" which is an amount equal to:

(i)   the sum of the Applicable Percentage of:

(A)   Charge-Offs; *plus*

(B)   Reimbursable Expenses attributable to Shared-Loss Assets;

*minus*

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-2

Colorado Capital Bank
City, State

(C)     Recoveries; and

(ii)     fifty per cent (50%) of collections on Fully Charged-Off Assets less fifty per cent (50%) of any expenses attributable to such Fully Charged-Off Assets, provided and only to the extent that such expenses would be Reimbursable Expenses if such Fully Charged-Off Assets were Shared-Loss Assets.

(b)     <u>Covered Gain Payments by the Assuming Institution</u>.  If the result of the calculation described in Section 2.3(a) is a negative amount (the "**Covered Gain**"), the Assuming Institution shall pay such amount to the Receiver.

**2.4.     <u>Payments Applicable to Recovery Quarters</u>**.  For each Recovery Quarter, pursuant to the applicable Quarterly Certificate, the payments described at (a) and (b) below shall be made, as appropriate, with respect to Shared-Loss Assets:

(a)     <u>Payments by the Receiver</u>.  The Receiver shall pay to the Assuming Institution an amount equal to the Applicable Percentage of any Reimbursable Expenses, for the period through and including the last Shared-Loss Quarter, which are specified on the Quarterly Certificate for the first Recovery Quarter.

(b)     <u>Payments by the Assuming Institution</u>.  The Assuming Institution shall pay to the Receiver:

(i)     an amount equal to the Applicable Percentage of Net Recoveries for each Recovery Quarter; *plus*

(ii)     an amount equal to fifty per cent (50%) of any collections on Fully Charged-Off Assets *minus* fifty per cent (50%) of any Reimbursable Expenses attributable to such Fully Charged-Off Assets.

(c)     <u>Net Recoveries</u>.  "**Net Recoveries**" means gross Recoveries during any Calendar Quarter *minus* Reimbursable Expenses during such Calendar Quarter.

(d)     <u>Negative Net Recoveries</u>.  If Net Recoveries received in a Recovery Quarter is a negative amount, then the amount of such Net Recoveries shall be offset against the amount of gross Recoveries received in the following Recovery Quarter to determine the amount of Net Recoveries for that following Recovery Quarter.  If, after applying the preceding provisions, Net Recoveries received in any subsequent Recovery Quarter is also a negative amount, the provisions of this Section 2.4(d) shall continue to apply to determine the amount of Net Recoveries in each such subsequent Recovery Quarter.

**2.5.     <u>True-Up Payment and Calculation</u>**.

(a)     <u>Payment Obligation of the Assuming Institution</u>.  If the Assuming Institution's Bid Amount, as set forth in Article VII of the Purchase and Assumption Agreement, includes an "Asset discount bid" which represents five percent (5%) or more of the purchase price of the Assets determined in accordance with Article III of the Purchase and Assumption Agreement, the Assuming Institution shall pay to the Receiver on the True-Up Date any positive amount resulting from the calculation set forth in <u>Exhibit 2.5</u>.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – <span style="font-variant: small-caps">Commercial Shared-Loss Agreement</span>
April 27, 2011

C-3

Colorado Capital Bank
City, State

(b)    Reporting of Calculation.  On or before the True-Up Date the Assuming Institution shall deliver to the Receiver a schedule, signed by the chief executive officer or the chief financial officer of the Assuming Institution, setting forth in reasonable detail the calculation described in Exhibit 2.5, including the calculation of the Net Loss Amount.

**2.6.    Limitation on Payments.**

(a)    Failure to Administer.  If the Assuming Institution fails to administer any Shared-Loss Asset in accordance with the provisions of Article 3, the Receiver may determine that such asset will not be treated as a Shared-Loss Asset pursuant to this Agreement.

(b)    Receiver's Right to Withhold Payment.  Notwithstanding any other provision of this Article 2, the Receiver may withhold all or any portion of a payment to the Assuming Institution of the amount requested in a Quarterly Certificate if the Receiver determines that:

(i)    the Quarterly Certificate is incomplete, inaccurate or untimely;

(ii)    based upon the Examination Criteria, a Charge-Off of a Shared-Loss Asset should not have been effected by the Assuming Institution;

(iii)    there is a reasonable basis under the terms of this Agreement for denying the eligibility of amounts included in a Quarterly Certificate for which reimbursement or payment is sought;

(iv)    with respect to a particular Shared-Loss Asset, the Assuming Institution has not complied or is not complying with the Management Standards;

(v)    the Assuming Institution has failed to comply with the requirements set forth in Section 5.5 including, but not limited to permitting the Receiver, its agents, contractors and/or employees to determine compliance with this Agreement pursuant to Section 5.5(c); or

(vi)    a retroactive accounting adjustment is to be made by the Receiver pursuant to Section 5.5(c).

(c)    Opportunity to Cure; Payment.

(i)    In the event that a determination is made to withhold an amount pursuant to Section 2.6(b), the Receiver shall provide the Assuming Institution with notice detailing the grounds for withholding such amount and the Assuming Institution shall cure any deficiency within a reasonable period of time.

(ii)    If the Assuming Institution demonstrates to the satisfaction of the Receiver that the grounds for withholding a payment, or any part thereof, no longer exist or have been cured, the Receiver shall pay the Assuming Institution the amount which the Receiver determines is eligible for payment within thirty (30) days following the date of such determination.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-4

Colorado Capital Bank
City, State

(iii)   If the Assuming Institution does not cure any such deficiency within a reasonable period of time, the Receiver may withhold payment as described in Section 2.6 (b) with respect to the affected Shared-Loss Asset(s), but such withholding will not affect the Receiver's obligation to make any other payment properly due pursuant to this Agreement.

(d)   Adjustments.   In the event that the Receiver withholds payment with respect to a Charge-Off of a Shared-Loss Asset or determines pursuant to Section 2.6(b) that a payment was improperly made, the Assuming Institution and the Receiver shall, upon final resolution of such issue, make such accounting adjustments and payments as may be necessary to give retroactive effect to such actions.

(e)   Interest on Payments.   Any payment by the Receiver pursuant to Section 2.6(d) shall be made together with interest on the amount thereof that accrues with effect from five (5) Business Days after the date on which payment was agreed or determined to be due until such amount is paid.   The annual interest rate shall be determined by the Receiver based on the coupon equivalent of the three (3)-month U.S. Treasury Bill Rate in effect as of the first Business Day of each Calendar Quarter during which such interest accrues as reported in the Federal Reserve Board Statistical Release for Selected Interest Rates H.15 opposite the caption "Treasury bills (secondary market), 3-Month" or, if not so reported for such day, for the next preceding Business Day for which such rate was so reported.

(f)   Determination of Disputes.   Any dispute arising under this Section 2.6 shall be resolved pursuant to the dispute resolution procedures of Article 7.

## 2.7.   Expenses.

(a)   Reimbursable Expenses.   Reimbursable Expenses incurred by the Assuming Institution for a product, service or activity may be reimbursable or recoverable by the Assuming Institution and may be included for the purpose of calculating payments relating to Shared-Loss Assets.   "**Reimbursable Expenses**" means actual, reasonable and necessary out-of-pocket expenses incurred in the usual, prudent and lawful management of a Shared-Loss Asset which are paid to third parties by or on behalf of the Assuming Institution or its Affiliates for a Shared-Loss Quarter or a Recovery Quarter, as applicable, in respect of the following expenditure:

(i)   expenses to recover amounts owed with respect to:

(A)   Shared-Loss Assets as to which a Charge-Off was effected prior to the end of the final Shared-Loss Quarter as reflected on the Accounting Records of the Assuming Institution; and

(B)   Failed Bank Charge-Offs;

(ii)   expenses to recover amounts described in paragraph (i) which relate to an Environmental Assessment and any environmental conditions relating to the Shared-Loss Assets, including remediation expenses for any pollutant or contaminant and fees for consultants retained to assess the presence, storage or release of any hazardous or

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-5

Colorado Capital Bank
City, State

toxic substance or any pollutant or contaminant relating to the collateral securing a Shared-Loss Asset that has been fully or partially charged-off, in each case up to a maximum of $200,000 per Shared-Loss Asset, except as provided in the last paragraph of this Section 2.7(a);

(iii)    ORE Expenses to the extent that such amount exceeds any ORE Income;

(iv)    reasonable and necessary litigation expenses with respect to maximizing Recoveries of Shared-Loss Assets but excluding amounts, if any, incurred with respect to any alleged improper conduct of the Assuming Institution;

(v)    fees incurred for attorneys, appraisers and other independent professional consultants engaged as necessary to assist in collections of Shared-Loss Assets, up to a maximum of $100,000 per Shared-Loss Asset, except as provided in the last paragraph of this Section 2.7(a);

(vi)    a proportion of expenses for collections by or on behalf of the Assuming Institution on an Asset other than a Shared-Loss Asset with a Book Value greater than zero which are applied to both that Book Value and to a Failed Bank Charge-Off, equal to the collections on such Asset which are applied to the Failed Bank Charge-Off divided by the total collections on such Asset; and

(vii)    with respect to the final Recovery Quarter, Reimbursable Expenses may include (A) a Net ORE Loss Carryforward if applicable and to the extent set forth in Section 2.9(g)(iii) and (B) any ORE Expenses to the extent that such amount exceeds ORE Income.

If the Assuming Institution estimates in good faith that required expenditures for the purposes described (A) in paragraph (ii) may exceed $200,000 or (B) in paragraph (v) may exceed $100,000 with respect to a particular Shared-Loss Asset, and provides the Receiver with advance notice and details thereof prior to incurring any such expenditure, the Receiver may, in its sole and absolute discretion, consent to such greater amount being deemed a Reimbursable Expense for purposes of this Agreement.

(b)    Exclusions.  Reimbursable Expenses do not include the following:

(i)    Capitalized Expenditures;

(ii)    amounts paid to Affiliates of the Assuming Institution;

(iii)    with respect to Shared-Loss Assets with prior Failed Bank Charge-Offs or Charge-Offs or write-downs for which the Assuming Institution is recognizing interest income as described in Section 2.9(d), the portion of the expense attributable to that Shared-Loss Loan which is derived by applying the calculation set forth in Exhibit 2.7;

(iv)    Federal, State or local income taxes and expenses related thereto;

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-6

Colorado Capital Bank
City, State

(v)     salaries, other compensation and related benefits of employees of the Assuming Institution and its Affiliates including, without limitation, bonus, commission or severance arrangements, training, payroll taxes, dues and travel- or relocation-related expenses;

(vi)     the cost of space occupied by the Assuming Institution or its Affiliates and their respective staff and the rental and maintenance of furniture and equipment;

(vii)     expenses for data processing, including the purchase or enhancement of data processing systems;

(viii)     except as expressly permitted in Sections 2.7(a)(ii) and 2.7(a)(v), fees for accounting and other independent professional consultants;

(ix)     allocated portions of any other overhead or general and administrative expense for services of a type which the Assuming Institution does not normally perform internally;

(x)     expenses not incurred in good faith and/or with the same degree of care that the Assuming Institution normally would exercise in the collection of troubled assets in which it alone had an interest;

(xi)     servicing fees payable to a third party (including a Third Party Servicer which is an Affiliate of the Assuming Institution), if the Assuming Institution would have provided those services had the relevant Shared-Loss Assets not been subject to this Agreement;

(xii)     in a Recovery Quarter, ORE Expenses to the extent that such amount exceeds ORE Income; and

(xiii)     expenses which exceed the amount of Recoveries made in any Recovery Quarter.

(c)     Reimbursable Expenses Incurred in Shared-Loss Quarters.  Reimbursable Expenses for Shared-Loss Quarters shall be submitted to the Receiver in each Quarterly Certificate, and in any event on or before the end of the first Recovery Quarter.

(d)     Reimbursable Expenses Incurred in Recovery Quarters.  Reimbursable Expenses for Recovery Quarters shall be submitted to the Receiver in the Quarterly Certificate for each Recovery Quarter, and in any event on or before the Termination Date.

(e)     Notification of Certain Expenditures.

(i)     Under certain circumstances the Assuming Institution may determine that, in order to maximize collection of a Shared-Loss Asset or an Asset on which a Failed Bank Charge-Off has been effected, there is a substantial likelihood that funds will need to be expended after the Bank Closing Date by or on behalf of the Assuming Institution to a third party for a specified purpose, which do not otherwise

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-7

Colorado Capital Bank
City, State

constitute Reimbursable Expenses.  If such expenditure is estimated to exceed ten percent (10%) of the Book Value of such Shared-Loss Asset or Asset, respectively, and that Shared-Loss Asset or Asset has a Legal Balance on the Accounting Records of the Assuming Institution of $1,000,000 or more, then the Assuming Institution shall promptly report such proposed expenditure to the Receiver, and may request that such expenditure be treated as a Permitted Expense.

(ii)   Within thirty (30) days following receipt of a notice pursuant to Section 2.7(e)(i), the Receiver will advise the Assuming Institution whether the Receiver grants or withholds its consent to the qualification of the proposed expenditures as a Reimbursable Expense.  If consent is withheld, the Assuming Institution shall not be required to make such expenditures and otherwise shall continue to administer such Shared-Loss Asset in accordance with the Management Standards.

**2.8.   Permitted Advances and Amendments.**  Pursuant to this Agreement, certain advances in respect of a Shared-Loss Loan and certain amendments in respect of a Shared-Loss Loan or a Shared-Loss Loan Commitment made by the Assuming Institution may be permissible additions to the Book Value of the Shared-Loss Assets, and entitle such Shared-Loss Assets to retain their status as such, if they satisfy certain criteria, as set forth below:

(a)   Permitted Advance.  A **"Permitted Advance"** is an advance on a Shared-Loss Loan which is made by the Assuming Institution in good faith, justified by contemporaneous supporting documentation in the Credit File, in accordance with the applicable requirements set forth in Article 3 and with the then effective written internal credit policy guidelines of the Assuming Institution and which meets the following criteria:

(i)   it is an advance made by the Assuming Institution, or a legally binding commitment by the Assuming Institution to advance funds and, in either case, funds are advanced fully within one (1) year from the Commencement Date; and

(A)   the sum of the following is less than 110% of the Book Value of such Shared-Loss Loan after such advance has been made:

(1)   the Book Value of such Shared-Loss Loan; *plus*

(2)   the unfunded amount of the legally binding commitment referred to at Section 2.8(a)(i) with respect to that Shared-Loss Loan;

(B)   the Assuming Institution has not taken a Charge-Off with respect to that Shared-Loss Loan; and

(C)   no Shared-Loss Loan Commitment exists for such Shared-Loss Loan; or

(ii)   it is an advance made by the Assuming Institution which the Assuming Institution determines is necessary to preserve or secure the value of the collateral for a Shared-Loss Loan.  In making such determination, the Assuming Institution shall apply the same criteria as it would if the Shared-Loss Assets were owned

by the Assuming Institution or any of its Affiliates, and subject to the limitation on expenses related to the remediation, presence, storage or release of any hazardous or toxic substance, pollutant or contaminant as set forth in Section 2.7(a)(ii).

(b)     Permitted Amendment.  A "**Permitted Amendment**" is, with respect to any Shared-Loss Loan Commitment or Shared-Loss Loan, any amendment, modification, renewal or extension thereof, or any waiver of any term, right or remedy thereunder which is made by the Assuming Institution in good faith, justified by contemporaneous supporting documentation in the Credit File, in accordance with the applicable requirements set forth in Article 3 and with the then effective written internal credit policy guidelines of the Assuming Institution.  A Permitted Amendment must also satisfy the following criteria:

(i)     the sum of the following is less than 110% of the Book Value of such Shared-Loss Loan after such amendment or modification has been made:

(A)     the Book Value of such Shared-Loss Loan; *plus*

(B)     the unfunded amount of any applicable Shared-Loss Loan Commitment, inclusive of amounts advanced pursuant to such amendment, modification, renewal or extension; and

(ii)     with respect to a Shared-Loss Loan Commitment or Shared-Loss Loan which is not a revolving line of credit, it does not increase the amount of principal (A) then remaining available to be advanced by the Assuming Institution under the Shared-Loss Loan Commitment or (B) then outstanding under the Shared-Loss Loan beyond the limit provided in Section 2.8(b)(i); or

(iii)     with respect to a Shared-Loss Loan Commitment or Shared-Loss Loan which is a revolving line of credit, it does not increase the maximum amount of principal authorized as of the Bank Closing Date to be outstanding at any one time under the underlying revolving line of credit relationship with the debtor beyond the limit provided in Section 2.8(b)(i) (regardless of the extent to which such revolving line of credit may have been funded as of the Bank Closing Date or may subsequently have been funded and/or repaid); and

(iv)     it does not extend the term of such Shared-Loss Loan Commitment or Shared-Loss Loan beyond the end of the final Shared-Loss Quarter or, if later, beyond the term which existed as of the Bank Closing Date.

**2.9.   Recovery**.

(a)     Calculation of a Recovery.  A "**Recovery**" is the sum of the following amounts (without duplication) for any period, subject to the limitations and exceptions set forth in Section 2.9(b):

(i)     collections by or on behalf of the Assuming Institution on Charge-Offs of a Shared-Loss Asset effected by the Assuming Institution prior to the end of the final Shared-Loss Quarter;

(ii)     collections by or on behalf of the Assuming Institution on Failed Bank Charge-Offs;

(iii)    collections by or on behalf of the Assuming Institution on any Asset on which a Failed Bank Charge-Off has been effected, to the extent that such collections exceed the Book Value of such Asset;

(iv)    ORE Income;

(v)     collections by or on behalf of the Assuming Institution of any Reimbursable Expenses;

(vi)    any gain received on a sale or other disposition of a Shared-Loss Loan or Shared-Loss Subsidiary by or on behalf of the Assuming Institution;

(vii)   the amount of any fee or other consideration received by or on behalf of the Assuming Institution for any amendment, modification, renewal, extension, refinance, restructure, commitment, sale or other similar action with respect to a Shared-Loss Loan as to which there exists a Failed Bank Charge-Off or as to which a Charge-Off has been effected by the Assuming Institution during or prior to such period, not exceeding the total of any related Failed Bank Charge-Offs, Charge-Offs and Reimbursable Expenses made with respect to the particular Shared-Loss Loan; and

(viii)  interest income, if any, pursuant to Section 2.9(d).

(b)     Limitations and Exceptions.  In calculating a Recovery, the following shall not be included:

(i)     amounts paid to the Assuming Institution by the Receiver pursuant to Article 2;

(ii)    amounts received by or on behalf of the Assuming Institution with respect to Charge-Offs effected by the Assuming Institution after the final Shared-Loss Quarter;

(iii)   the amount of any gain with respect to Shared-Loss Loans, ORE, Additional ORE or Subsidiary ORE included in a Recovery which exceeds the total amount of any Failed Bank Charge-Offs, Charge-Offs and Reimbursable Expenses made with respect to the particular Shared-Loss Asset; and

(iv)    after the final Shared-Loss Quarter, ORE Income except to the extent that aggregate ORE Income exceeds ORE Expenses.

(c)     Order of Application.  For the purpose of calculating Recoveries, the Assuming Institution shall apply any collections received on an Asset not otherwise applied to reduce the Book Value of such Asset, if applicable, in the following order:

(i)     to Charge-Offs and Failed Bank Charge-Offs;

(ii)    to Reimbursable Expenses;

(iii)  to interest income; and

(iv)  to other expenses incurred by the Assuming Institution which are not Reimbursable Expenses.

(d)  <u>Interest Income as a Recovery</u>.  In the event that (i) there is any amendment, modification, renewal, extension, refinance, restructure, commitment, sale or other similar action with respect to a Shared-Loss Loan as to which there exists a Failed Bank Charge-Off or as to which a Charge-Off has been effected by the Assuming Institution during or prior to a Recovery Period and (ii) as a result, the Assuming Institution recognizes interest income for financial accounting purposes on that Shared-Loss Loan, then a Recovery shall also include the portion of such interest income recognized by the Assuming Institution which is derived by applying the calculation set forth in <u>Exhibit 2.9</u>, subject to the limitations set forth in Section 2.9(e).

(e)  <u>Maximum Amount of Interest Income</u>.  The amount of any interest income included as a Recovery with respect to a Shared-Loss Loan subject to Section 2.9(d) shall not exceed the total of the following:

(i)  Failed Bank Charge-Offs;

(ii)  Charge-Offs effected by the Assuming Institution during or prior to the period in which the amount of a Recovery is being determined; and

(iii)  Reimbursable Expenses paid to the Assuming Institution pursuant to this Agreement during or prior to the period in which the amount of a Recovery is being determined, all with respect to that particular Shared-Loss Loan.

(f)  <u>Application of Collections</u>.  Any collections on a Shared-Loss Loan that are not applied to reduce Book Value of principal or recognized as interest income shall be applied pursuant to Section 2.9(c).

(g)  <u>Treatment of Net ORE Loss Carryforward</u>.  To determine whether the Assuming Institution is entitled to apply a Net ORE Loss Carryforward at the end of the final Recovery Quarter, the Assuming Institution shall calculate and report the following information with respect to Recovery Quarters:

(i)  For any Recovery Quarter other than the final Recovery Quarter, Net ORE Income is calculated as the amount of ORE Income received during such Recovery Quarter less (A) ORE Expenses paid to third parties during such Recovery Quarter and (B) if applicable, Net ORE Loss Carryforward.  Any positive Net ORE Income shall be reported as a Recovery on the Quarterly Certificate for such Recovery Quarter.

(ii)  For the final Recovery Quarter, Net ORE Income is calculated as the amount of ORE Income received during the final Recovery Quarter less ORE Expenses from the beginning of the final Recovery Quarter up to the date the Assuming Institution is required to deliver the Final Recovery Certificate pursuant to this Agreement.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements<br>Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT<br>April 27, 2011

C-11

Colorado Capital Bank<br>City, State

(iii)    If there is a Net ORE Loss Carryforward at the end of the final Recovery Quarter, an amount equal to the Net ORE Loss Carryforward up to but not exceeding the total Net ORE Income reported as a Recovery on Quarterly Certificates for all Recovery Quarters may be included as a Recovery Expense on the Final Recovery Certificate.

**2.10.    Treatment as a Shared-Loss Asset.**

(a)    Loss of Right to Receive Shared-Loss Asset Payments.  The Assuming Institution shall not be entitled to payments relating to a Shared-Loss Asset pursuant to Section 2.2 if the Assuming Institution or any Affiliate of the Assuming Institution:

(i)    sells or otherwise transfers that Shared-Loss Asset or any interest therein (whether with or without recourse) to any Person, other than in compliance with this Agreement;

(ii)    makes any additional advance, commitment or increase in the amount of a commitment with respect to that Shared-Loss Loan that does not constitute a Permitted Advance or a Shared-Loss Loan Commitment Advance, in which case the entire Shared-Loss Loan will not be entitled to such payments;

(iii)    makes any amendment, modification, renewal or extension of that Shared-Loss Loan that does not constitute a Permitted Amendment;

(iv)    manages, administers or collects any Related Loan in a manner which would increase the amount of any collections with respect to that Related Loan to the detriment of the Shared-Loss Asset to which such loan is related; or

(v)    fails to administer that Shared-Loss Asset pursuant to the Management Standards, including, without limitation, consistent failure to provide complete, accurate and timely certificates and reports pursuant to Article 5.

(b)    Effective Date of Loss of Shared-Loss Asset Treatment.  If any of the actions described in Section 2.10(a) occur with respect to a Shared-Loss Asset, the Receiver shall not be obligated to make any payments to the Assuming Institution with respect to any affected Shared-Loss Loan after the date of occurrence of such action.  In the event that the Receiver withholds payment pursuant to the foregoing provisions, the Assuming Institution and the Receiver shall make such accounting adjustments and payments as may be necessary to give retroactive effect to such actions.

(c)    Treatment of Recoveries.  Notwithstanding Sections 2.10(a) and (b), a Shared-Loss Loan which has been the subject of Charge-Offs prior to the occurrence of any action described in Section 2.10(a) shall be treated as a Shared-Loss Asset for the purpose of calculating Recoveries on such Charge-Offs, provided that the amount of Recoveries shall be limited to the amount of such Charge-Offs.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-12

Colorado Capital Bank
City, State

**2.11.   Receiver's Option to Purchase.**

(a)   Exercise of Option to Purchase.   At any time on or prior to the Termination Date, the Receiver shall have the option, exercisable by notice to the Assuming Institution, to purchase a Shared-Loss Asset or an Asset on which a Failed Bank Charge-Off has been effected which meets any of the following criteria:

(i)   if the Shared-Loss Asset has been fully or partially charged-off or written down and the Receiver determines that the Assuming Institution is not diligently pursuing collection efforts with respect to such Shared-Loss Asset;

(ii)   if the Shared-Loss Asset is the subject of a request pursuant to Section 2.7(e), notwithstanding any prior consent by the Receiver with respect to any requested expenditures;

(iii)   if it is an Asset on which a Failed Bank Charge-Off has been effected; and

(iv)   if the Shared-Loss Asset is a Related Loan required to be included in a schedule pursuant to Section 5.4.

(b)   Transfer by the Assuming Institution.   Within ten (10) Business Days following the date upon which the Assuming Institution receives notice pursuant to Section 2.11(a), the Assuming Institution shall transfer to the Receiver such Shared-Loss Asset or Asset and all Credit Files and Accounting Records relating thereto and shall take all such other actions as may be necessary and appropriate to assign, transfer and convey such Shared-Loss Asset or Asset to the Receiver.

(c)   Payment by the Receiver.   Within fifteen (15) Business Days after the date upon which the Assuming Institution transfers the Shared-Loss Asset or Asset pursuant to Section 2.11(b), the Receiver shall pay to the Assuming Institution a purchase price equal to:

(i)   the principal amount of such Shared-Loss Asset, any fees or penalties due from an Obligor and any Accrued Interest (subject to the limitations set forth at Section 2.11(d)), as stated on the Accounting Records of the Assuming Institution, as of the date such price is determined (in the case of a Shared-Loss Loan, regardless of the Legal Balance thereof) plus all Reimbursable Expenses incurred up to and through the transfer date of such Shared-Loss Asset pursuant to Section 2.11(b) which have not previously been paid to the Assuming Institution; *minus*

(ii)   the Related Liability Amount applicable to any Related Liabilities related to such Shared-Loss Asset or Asset.

(d)   Limitations on Payment by the Receiver.   In the case of the purchase of a Shared-Loss Loan:

(i)   the price paid pursuant to Section 2.11(c) shall not include any Accrued Interest accruing during the ninety (90) day period prior to the purchase date

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-13

Colorado Capital Bank
City, State

pursuant to Section 2.11(b), except to the extent that such Accrued Interest is included in the Book Value of such Shared-Loss Loan;

(ii)   the Receiver shall be entitled to any collections received by the Assuming Institution after the purchase date, which shall be paid by the Assuming Institution forthwith upon receipt and in any event no later than simultaneously with delivery of the next Quarterly Certificate; and

(iii)   for the purposes of determining the amount of unpaid interest which accrued during a given period with respect to a variable-rate Shared-Loss Loan, all collections of interest shall be deemed to be applied to unpaid interest in the chronological order (oldest first) in which such interest accrued.

(e)   Receiver's Assumption of Related Liabilities.  The Receiver shall assume all Related Liabilities with respect to any Shared-Loss Asset or Asset repurchased pursuant to this Section 2.11 with effect from the date of transfer of such Shared-Loss Asset or Asset.

**ARTICLE 3.   ADMINISTRATION OF SHARED-LOSS ASSETS.**

**3.1.   Management Standards Regarding Administration**.  During the term of this Agreement the Assuming Institution shall manage, administer and collect all Shared-Loss Assets while owned by it or any of its Affiliates in accordance with the rules, requirements and standards regarding management, administration and collection of Shared-Loss Assets set forth in this Article 3 (the "**Management Standards**").  Failure to comply with the Management Standards shall constitute a material breach of this Agreement.  If the Receiver determines in its sole and absolute discretion that the Assuming Institution is not in compliance with the Management Standards, it may notify the Assuming Institution of the breach and may take action pursuant to this Agreement including, without limitation, as provided in Sections 2.6(a) and (b).

**3.2.   Assuming Institution's Responsibilities and Duties**.

(a)   Covenants of the Assuming Institution.  The Assuming Institution shall:

(i)   be responsible to the Receiver and the Corporation in the performance of this Agreement, whether performed by the Assuming Institution, an Affiliate or a Third Party Servicer;

(ii)   provide to the Receiver and the Corporation such certificates, notifications and reports as the Receiver or the Corporation reasonably deems advisable, including but not limited to the certificates, notifications and reports required by Article 5; and

(iii)   permit the Receiver and the Corporation to monitor the Assuming Institution's performance of its duties hereunder at all times.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-14

Colorado Capital Bank
City, State

(i)     comply in all respects with any direction from the Receiver or the Corporation and with any protocols, directives or interpretive memoranda issued from time to time by the Receiver or the Corporation;

(ii)    upon request of the Receiver, notify the Receiver of the status of any legal action in which any special legal power or right is utilized; and

(iii)   immediately notify the Receiver of any judgment or significant order in any legal action involving any of such special powers or rights.

**3.5.    Tax Ruling.**    The Assuming Institution shall not at any time, without the Corporation's prior consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Receiver pursuant to this Agreement.

**ARTICLE 4.      SALE OF CERTAIN SHARED-LOSS ASSETS.**

**4.1.    Sales of Shared-Loss Assets**.   All sales of Shared-Loss Assets are subject to the prior written approval of the Receiver, except as provided in Section 4.3:

(a)     Sales with the Receiver's Consent.   After the fourth anniversary of the Commencement Date and with the prior consent of the Receiver, the Assuming Institution may conduct sales to liquidate for cash consideration, in one or more transactions, all or a portion of the Shared-Loss Assets (individually or in portfolio transactions) then held by the Assuming Institution.  The Assuming Institution shall provide the Receiver with at least sixty (60) days notice prior to any such proposed sale and the notice shall set forth the sale details and the proposed sale schedule.

(b)     Sales Required by the Receiver.   During the twelve (12) month period immediately prior to the Termination Date the Receiver may, in its sole and absolute discretion, require the Assuming Institution to liquidate for cash consideration, in one or more transactions, all Shared-Loss Assets then held by the Assuming Institution.  If the Receiver exercises such right, it shall give notice to the Assuming Institution setting forth the time period within which the Assuming Institution shall be required to offer to sell the Shared-Loss Assets.  The Assuming Institution shall make a good faith effort to sell the Shared-Loss Assets and to otherwise comply with the provisions of the Receiver's notice.

(c)     Conduct of Sales.   Any sale pursuant to this Section 4.1 shall be conducted by means of sealed bid, to third parties, which may not include any Affiliates of the Assuming Institution, any contractors of the Assuming Institution or any Affiliates of contractors of the Assuming Institution.  The Assuming Institution shall notify the Receiver prior to the proposed appointment of any financial advisor or other third party broker or sales agent for the liquidation of the remaining Shared-Loss Assets pursuant to Section 4.1(b).  The Receiver may object to such proposed appointment by giving the Assuming Institution notice that it so objects within thirty (30) days following the Receiver's receipt of the notice of the proposed appointment.

**4.2.    Calculation of Gain or Loss on Sale.**   The gain or loss on sales conducted in accordance with the provisions of Section 4.1 will be calculated based on the gross sale price

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-17

Colorado Capital Bank
City, State

received by the Assuming Institution less the Book Value of the Shared-Loss Assets which are sold.

**4.3.**   **Sale of ORE, Additional ORE or Subsidiary ORE**.   Notwithstanding the provisions of Section 4.1, the Assuming Institution may sell or otherwise dispose of ORE, Additional ORE or Subsidiary ORE at any time to a Person other than an Affiliate, a contractor of the Assuming Institution or any Affiliate of a contractor of the Assuming Institution, provided that such sale is conducted in an arm's length, commercially reasonable and prudent manner.

**ARTICLE 5.**   **CERTIFICATES, REPORTS AND RECORDS**.

**5.1.**   **Reporting Obligations of the Assuming Institution**.

(a)   Records, Notifications and Reports.   The Assuming Institution shall maintain such records, provide such notifications and deliver such reports as are required pursuant to this Agreement, including, without limitation, the records, notifications and reports as provided in the following provisions of this Article 5.  Nothing contained in this Agreement shall be deemed to modify any laws, regulations or orders that are otherwise applicable to the Assuming Institution.

(b)   Certification of Accuracy and Completeness.   Every submission by the Assuming Institution to the Receiver of a Quarterly Certificate, the Final Recovery Certificate and any other document or information shall constitute a certification from the Assuming Institution that the information provided in such submission is correct, complete and in compliance with this Agreement.

**5.2.**   **Quarterly Certificates**.

(a)   Shared-Loss Quarters.  Within thirty (30) days after the end of each Shared-Loss Quarter, the Assuming Institution shall deliver to the Receiver a Quarterly Certificate setting forth the following information with respect to each such Shared-Loss Quarter, in such form and detail as the Receiver may specify from time to time:

(i)   Charge-Offs with respect to Shared-Loss Assets;

(ii)   Recoveries;

(iii)   collections on Assets on which a Failed Bank Charge-Off has been effected;

(iv)   aggregate Charge-Offs less Recoveries;

(v)   Reimbursable Expenses; and

(vi)   ORE Income.

(b)   Recovery Quarters.  Not later than thirty (30) days after the end of each Recovery Quarter, the Assuming Institution shall deliver to the Receiver a Quarterly Certificate setting forth the information specified in Section 5.2(a) and the following information with

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-18

Colorado Capital Bank
City, State

(b)     Additional Information.  The Assuming Institution shall promptly provide to the Receiver or the Corporation such information as the requesting party may request from time to time, including financial statements, computations and information as the Receiver or the Corporation deems necessary or appropriate in connection with monitoring compliance with this Agreement, certified as correct by the chief executive officer or chief financial officer of the Assuming Institution if so requested.  The Assuming Institution shall provide to the Receiver all such loan-level data and cumulative information regarding the Shared-Loss Assets as the Receiver may request from time to time.

## ARTICLE 6.     MISCELLANEOUS.

**6.1.     Expenses**.   All costs and expenses incurred by a party in connection with this Agreement (including the performance of any obligations or the exercise of any rights hereunder) shall be borne by such party unless expressly otherwise provided, whether or not the transactions contemplated herein are consummated.

**6.2.   Successors and Assigns**.

(a)     Binding on Successors and Assigns; Assignment.  This Agreement, and all of the terms and provisions hereof shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns only.  The Receiver may assign or otherwise transfer this Agreement and the rights and obligations of the Receiver hereunder (in whole or in part) to the Corporation in its corporate capacity without the consent of the Assuming Institution.  Notwithstanding anything to the contrary contained in this Agreement, the Assuming Institution may not assign or otherwise transfer this Agreement or any of the Assuming Institution's rights or obligations hereunder (in whole or in part) or sell or transfer any subsidiary of the Assuming Institution holding title to Shared-Loss Assets without the prior written consent of the Receiver, which consent may be granted or withheld by the Receiver in its sole and absolute discretion.  An assignment or transfer of this Agreement includes:

(i)     a merger or consolidation of the Assuming Institution with or into another Person, if the shareholders of the Assuming Institution will own less than sixty-six and two/thirds percent (66.66%) of the equity of the consolidated entity;

(ii)     a merger or consolidation of the Assuming Institution's Holding Company with or into another Person, if the shareholders of the Holding Company will own less than sixty-six and two/thirds percent (66.66%) of the equity of the consolidated entity;

(iii)     the sale of all or substantially all of the assets of the Assuming Institution to another Person; or

(iv)     a sale of Shares by any one or more shareholders that will effect a change in control of the Assuming Institution, as determined by the Receiver with reference to the standards set forth in the Change in Bank Control Act, 12 U.S.C. 1817(j).

Any transaction under this Section 6.2 that requires the Receiver's consent that is made without such consent will relieve the Receiver of its obligations under this Agreement.

(b)   <u>No Recognition of Loss</u>.   No loss shall be recognized under this Agreement as a result of any accounting adjustments that are made due to or as a result of any assignment or transfer of this Agreement or any merger, consolidation, sale or other transaction to which the Assuming Institution, its Holding Company or any Affiliate is a party, regardless of whether the Receiver consents to such assignment or transfer in connection with such transaction pursuant to this Section 6.2.

**6.3.   WAIVER OF JURY TRIAL.   EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ALL RIGHT TO TRIAL BY JURY IN, OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR RELATING TO OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.**

**6.4.   No Third Party Beneficiary**.   This Agreement is for the sole and exclusive benefit of the parties and their respective permitted successors and permitted assigns and there shall be no other third party beneficiaries.  Nothing in this Agreement shall be construed to grant to any other Person any right, remedy or claim under or in respect of this Agreement or any provision hereof.

**6.5.   Consent; Determination or Discretion**.   When the consent or approval of a party is required under this Agreement, such consent or approval shall be obtained in writing and unless expressly otherwise provided, shall not be unreasonably withheld or delayed.  When a determination or decision is to be made by a party under this Agreement, that party shall make such determination or decision in its reasonable discretion unless expressly otherwise provided.

**6.6.   Rights Cumulative**.   Except as expressly otherwise provided herein, the rights of each of the parties under this Agreement are cumulative, may be exercised as often as any party considers appropriate and are in addition to each such party's rights under the Purchase and Assumption Agreement, any of the agreements related thereto or under applicable law.  Any failure to exercise or any delay in exercising any of such rights, or any partial or defective exercise of such rights, shall not operate as a waiver or variation of that or any other such right, unless expressly otherwise provided.

**6.7.   References**.   References in this Agreement to Recitals, Articles, Sections and Exhibits are to Recitals, Articles, Sections and Exhibits of this Agreement, respectively, unless the context indicates that the Purchase and Assumption Agreement is intended.  References to parties are to the parties to this Agreement.  Unless expressly otherwise provided, references to days and months are to calendar days and months respectively.  Article and Section headings are for convenient reference and shall not affect the meaning of this Agreement.  References to the singular shall include the plural, as the context may require, and *vice versa*.

**6.8.   Notice**.

(a)   <u>Form of Notices</u>.   All notices shall be given in writing to the parties at the addresses set forth in Sections 6.8(b) and 6.8(c) and sent in accordance with the provisions of Section 13.6 of the Purchase and Assumption Agreement, unless expressly otherwise provided.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-23

Colorado Capital Bank
City, State

following the request that it make such disclosure, and in any event prior to making such disclosure, so that the other party or parties may seek a protective order.

**7.20.** **Confidentiality of Arbitration Award**.   Notwithstanding the provisions of Section 7.19, no party has any duty of confidentiality with respect to any arbitration award made pursuant to this Article 7.

**7.21.** **Extension of Time Periods**.   The parties may extend any period of time provided in this Article 7 by mutual agreement.

**7.22.** **Venue**.   The arbitration shall take place at such location as the parties thereto may mutually agree, but if they cannot agree, then it will take place at the offices of the Corporation in Washington, D.C., or Arlington, Virginia.

**ARTICLE 8.**   **DEFINITIONS.**   The capitalized terms used in this Agreement have the meanings defined or referenced in this Article 8.

"**AAA**" has the meaning set forth in Section 7.6(c).

"**Accounting Records**" means Records including, but not limited to, corporate minutes, general ledger and subsidiary ledgers and schedules which support general ledger balances.

"**Accrued Interest**" means, for any Shared-Loss Loan, Permitted Advance or Shared-Loss Loan Commitment Advance at any time, the amount of accrued earned and unpaid interest, taxes, credit life and/or disability insurance premiums (if any) payable by the Obligor, all as reflected on the Accounting Records of the Failed Bank or the Assuming Institution (as applicable), but excluding any amount accrued after the applicable Asset has been placed on non-accrual or nonperforming status by either the Failed Bank or the Assuming Institution (as applicable), for no more than a maximum of ninety (90) days.

"**Additional ORE**" means Shared-Loss Loans that become ORE after the Bank Closing Date.

"**ADRA**" has the meaning set forth in Section 7.3.

"**Affiliate**" has the meaning set forth in the Purchase and Assumption Agreement; provided that, for purposes of this Agreement, no Third Party Servicer appointed by an Affiliate shall be deemed to be an Affiliate of the Assuming Institution solely by virtue of that appointment.

"**Agreement**" has the meaning set forth in Recital A.

"**Applicable Percentage**" is eighty percent (80%) for the Tranche 1 Amount; zero percent (0%) for the Tranche 2 Amount; and eighty percent (80%) for the Tranche 3 Amount.

"**Arbitration Administrator**" has the meaning set forth in Section 7.6(f).

"**Arbitration Hearing**" has the meaning set forth in Section 7.10(a)(iii).

"**Assets**" has the meaning set forth in the Purchase and Assumption Agreement.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-30

Colorado Capital Bank
City, State

"**Assuming Institution**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Bank Closing Date**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Bank Premises**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Bid Valuation Date**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Book Value**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Business Day**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Calendar Quarter**" means a period of three months in any year, commencing on the first day of each January, April, July or October, and each successive three-month period thereafter, except that the first such period shall commence on the Commencement Date and end on the last day of March, June, September or December, whichever is the first to occur after the Commencement Date.

"**Capitalized Expenditures**" means those expenditures that (a) would be capitalized under generally accepted accounting principles and (b) are incurred with respect to Shared-Loss Loans, ORE, Additional ORE or Subsidiary ORE, but excluding expenses related to environmental conditions including, but not limited to, remediation, storage or disposal of any hazardous or toxic substances or any pollutant or contaminant.

"**Charge-Off**" means, for any period with respect to a particular Shared-Loss Asset, the amount of a loan or portion of a loan classified as "Loss" under the Examination Criteria as effected by the Assuming Institution and reflected on its Accounting Records for such period, consisting solely of a charge-off of the following:

      (a)    the principal amount of such Shared-Loss Asset net of unearned interest;

      (b)    a write-down associated with Shared-Loss Assets, ORE or Additional ORE or loan modification(s);

      (c)    Accrued Interest for no more than a maximum of ninety (90) days; *plus*

      (d)    Capitalized Expenditures.

No Charge-Off shall be taken with respect to any anticipated expenditure by the Assuming Institution until such expenditure is actually incurred.

Losses incurred on the sale or other disposition of Shared-Loss Assets to any Person shall not constitute Charge-Offs except for: (i) sales duly conducted in accordance with the provisions of Sections 4.1(a) and 4.1(b), (ii) the sale or other disposition of ORE or Additional ORE to a Person other than an Affiliate of the Assuming Institution which was conducted in a commercially reasonable and prudent manner and (iii) other sales or dispositions, if any, with respect to which the Receiver granted prior consent.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-31

Colorado Capital Bank
City, State

"**Chartering Authority**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Claimant Party**" has the meaning set forth in Section 7.6(a).

"**Commencement Date**" means the first day following the Bank Closing Date.

"**Commercial Arbitration Rules**" has the meaning set forth in Section 7.9.

"**Commitment**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Confidential Information**" has the meaning set forth in Section 7.19.

"**Consumer Loans**" means loans to individuals for household, family and other personal expenditures, that are not secured by real estate, including but not limited to loans for (a) purchase of private automobiles, pickup trucks, household appliances, furniture, trailers and boats; (b) repairs or improvements to a borrower's residence; (c) educational expenses, including student loans, whether or not guaranteed by the United States or any state; (d) medical expenses; (e) taxes; (f) vacations; (g) personal (non-business) debt consolidation; and (h) purchase of a mobile home to be used as a residence which is not combined with real property. Consumer Loans may be installment loans, demand loans or single payment time loans, regardless of size or maturity and regardless of whether the loans are made by the consumer loan department or by any other department of the Failed Bank. Consumer Loans also include retail installment sales paper purchased by the Failed Bank from merchants or dealers, finance companies and others and extensions of credit pursuant to a credit card plan or debit card plan.

"**Corporation**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Covered Gain**" has the meaning set forth in Section 2.3(b).

"**Covered Loss**" has the meaning set forth in Section 2.3(a).

"**Credit File**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Dispute Item**" has the meaning set forth in Section 7.1(b).

"**Environmental Assessment**" means an assessment relating to the presence, storage or release of any hazardous or toxic substance, pollutant or contaminant with respect to the collateral securing a Shared-Loss Loan that has been fully or partially charged-off.

"**Examination Criteria**" means the loan classification criteria employed by, and any applicable regulations of, the Assuming Institution's Chartering Authority at the time an action is taken, as such criteria may be amended from time to time.

"**Failed Bank**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Failed Bank Charge-Offs**" means, with respect to any Asset, an amount equal to the aggregate reversals or charge-offs of Accrued Interest and charge-offs and write-downs of principal effected by the Failed Bank with respect to that Asset as reflected on the Accounting Records of the Failed Bank, excluding any Fully-Charged-Off Assets.

"**Federal Arbitration Act**" has the meaning set forward in Section 7.9.

"**Final Recovery Certificate**" means the Quarterly Certificate for the final Recovery Quarter.

"**Fixtures**" has the meaning set forth in the Purchase and Assumption Agreement.

"**FDIC**" means the Federal Deposit Insurance Corporation, in any capacity, as appropriate.

"**FDIC Party**" has the meaning set forth in Section 7.2.

"**Fully Charged-Off Assets**" means Assets subject to Failed Bank Charge-Offs that were completely charged-off by the Failed Bank and had a Book Value of zero on the Bank Closing Date.

"**Holding Company**" means any company owning Shares of the Assuming Institution that is a holding company pursuant to the Bank Holding Company Act of 1956, 12 U.S.C. 1841 *et seq.* or the Home Owners' Loan Act, 12 U.S.C. 1461 *et seq.*

"**Investment in Subsidiary**" means the amount of the Failed Bank's direct and indirect investment in a Shared-Loss Subsidiary, including any amounts due from that Shared-Loss Subsidiary to the Failed Bank that were acquired by the Assuming Institution, calculated as of the Commencement Date.

"**Intrinsic Loss Estimate**" is two hundred eighty five million seven hundred seven thousand, seven hundred sixty three dollars ($285,707,763).

"**Legal Balance**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Loan**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Management Standards**" has the meaning set forth in Section 3.1.

"**Member**" has the meaning set forth in Section 7.10.

"**Net Loss Amount**" means the sum of all Covered Losses less all Covered Gains and, if the Purchase and Assumption Agreement includes a Single Family Agreement, the Cumulative Loss Amount under and as defined in the Single Family Agreement.

"**Net ORE Income**" means the extent to which aggregate ORE Income exceeds ORE Expenses, as described in Section 2.9(g)(i) or (ii), as appropriate.

"**Net ORE Loss Carryforward**" means the amount of any ORE Income in any Recovery Quarter that is a negative number.

"**Net Recoveries**" has the meaning set forth in Section 2.4(c).

"**Neutral Member**" has the meaning set forth in Section 7.10(a)(ii).

"**New Shared-Loss Loans**" means loans that would otherwise be subject to loss sharing

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-33

Colorado Capital Bank
City, State

under this Agreement that were originated after the Bid Valuation Date and before the Bank Closing Date.

"**Notice of Dispute**" has the meaning set forth in Section 7.3.

"**Obligor**" has the meaning set forth in the Purchase and Assumption Agreement.

"**ORE**" means the following that (a) are owned by the Failed Bank as of the Bank Closing Date and purchased pursuant to the Purchase and Assumption Agreement or (b) have been acquired subsequent to the Bank Closing Date from the collection or settlement by the Assuming Institution of a Shared-Loss Loan, including, without limitation, any assets which have been fully or partially charged-off on the books and records of the Failed Bank or the Assuming Institution:

(a)     interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights; and

(b)     other assets (whether real property, furniture, fixtures or equipment and, at the option of the Receiver, other personal property) acquired by foreclosure of ORE or in full or partial satisfaction of judgments or indebtedness.

"**ORE Expenses**" means the aggregate expenses paid to third parties by or on behalf of the Assuming Institution after the final Shared-Loss Quarter to manage, operate and maintain ORE, Additional ORE and Subsidiary ORE, which may include property taxes, insurance and sales commissions, provided that such commissions are of an amount customary for the type and location of the asset.

"**ORE Income**" means income received by or on behalf of the Assuming Institution or its Affiliate(s) from the operation, and any gains recognized by the Assuming Institution on the disposition, of ORE, Additional ORE and Subsidiary ORE.

"**Party-Appointed Arbitrator**" has the meaning set forth in Section 7.10(a)(ii).

"**Permitted Advance**" has the meaning set forth in Section 2.8(a).

"**Permitted Amendment**" has the meaning set forth in Section 2.8(b).

"**Person**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Purchase and Assumption Agreement**" has the meaning set forth in Recital A.

"**Quarterly Certificate**" means a certificate or certificates, signed by an officer of the Assuming Institution involved in, or responsible for, the administration and servicing of the Shared-Loss Assets, whose name appears on a list provided to the Receiver (as updated by the Assuming Institution as needed from time to time) of servicing officers and the related supporting documentation setting forth in such form and detail as the Receiver may specify from time to time the items listed at Section 5.2(a), in the form set forth in Exhibit 5.2 and delivered as set forth in Article 5 of this Agreement.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-34

Colorado Capital Bank
City, State

"**Receiver**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Record**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Recovery**" has the meaning set forth in Section 2.9.

"**Recovery Quarter**" means a Calendar Quarter commencing with and including the first Calendar Quarter following the final Shared-Loss Quarter and ending on the Termination Date.

"**Reimbursable Expenses**" has the meaning set forth in Section 2.7(a).

"**Related Liability**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Related Liability Amount**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Related Loan**" means a loan or extension of credit held by the Assuming Institution at any time on or prior to the end of the final Recovery Quarter that is:

(a)     made to the same Obligor with respect to a Loan that is a Shared-Loss Asset or with respect to a Loan from which ORE, Additional ORE or Subsidiary ORE derived; or

(b)     attributable to the same primary Obligor with respect to any Loan described at paragraph (a) under the applicable rules of the Assuming Institution's Chartering Authority concerning the legal lending limits of financial institutions organized under its jurisdiction as in effect on the Commencement Date.

"**Respondent Party**" has the meaning set forth in Section 7.6(b).

"**Review Board**" has the meaning set forth in Section 7.10.

"**Settlement Interest Rate**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Shared-Loss Assets**" means Shared-Loss Loans, Subsidiary Shared-Loss Loans, ORE, Additional ORE, Subsidiary ORE and Capitalized Expenditures.

"**Shared-Loss Loan Commitment**" means (a) a Commitment to make a further extension of credit or a further advance with respect to an existing Shared-Loss Loan or (b) a Shared-Loss Loan in respect of which the Assuming Institution has made a Permitted Amendment.

"**Shared-Loss Loan Commitment Advance**" means an advance pursuant to a Shared-Loss Loan Commitment with respect to which the Assuming Institution has not made a Permitted Advance.

"**Shared-Loss Loans**" means the following:

(a)     Loans purchased by the Assuming Institution pursuant to the Purchase and Assumption Agreement set forth on Schedule 4.15B thereto;

(b)     New Shared-Loss Loans purchased by the Assuming Institution pursuant to the Purchase and Assumption Agreement;

(c)     Permitted Advances;

(d)     Shared-Loss Loan Commitment Advances, if any; and

(e)     Shared-Loss Loans (as described at paragraphs (b) through (d) above) with respect to which the Assuming Institution has made a Permitted Amendment;

but does not include:

(i)     Consumer Loans; or

(ii)    Loans, New Shared-Loss Loans, Permitted Advances or Shared-Loss Loan Commitment Advances with respect to which a Shared-Loss Subsidiary is an Obligor.

"**Shared-Loss Quarter**" means a Calendar Quarter commencing with the initial Calendar Quarter and ending with and including the Calendar Quarter in which the fifth (5th) anniversary of the Commencement Date occurs.

"**Shared-Loss Subsidiary**" and "**Shared-Loss Subsidiaries**" mean the Subsidiary or Subsidiaries, if any, listed on Schedule 4.15D, as applicable.

"**Shares**" means common stock and any instrument which by is, or which may become, convertible into common stock.

"**Single Family Agreement**" means, if any, the Single Family Shared-Loss Agreement and the Exhibits thereto attached as Exhibit 4.15A to the Purchase and Assumption Agreement and entered into of even date with this Agreement among the Receiver, the Corporation and the Assuming Institution.

"**Subsidiary**" has the meaning set forth in the Purchase and Assumption Agreement.

"**Subsidiary ORE**" means ORE listed on Schedule 4.15D and owned by the Shared-Loss Subsidiary identified on that Schedule 4.15D as the owner of such ORE.

"**Subsidiary Shared-Loss Loans**" means Shared-Loss Loans listed on Schedule 4.15D owned by the Shared-Loss Subsidiary identified on that Schedule 4.15D as the owner of such Shared-Loss Loans.

"**Termination Date**" means the last day of the Calendar Quarter in which the eighth (8th) anniversary of the Commencement Date occurs.

"**Third Party Servicer**" means any servicer appointed from time to time by the Assuming Institution, which may include an Affiliate of the Assuming Institution, to service the

C-36

Shared-Loss Assets on behalf of the Assuming Institution.

"**Tranche 1 Amount**" means a Net Loss Amount up to and including two hundred thirty million nine hundred ninety thousand, eight hundred seventy four dollars ($230,990,874).

"**Tranche 2 Amount**" means a Net Loss Amount in excess of the Tranche 1 Amount up to and including two hundred eighty five million nine hundred forty six thousand, seven hundred ninety eight dollars ($285,946,798).

"**Tranche 3 Amount**" means a Net Loss Amount in excess of the Tranche 2 Amount.

"**True-Up Date**" means the date which is forty-five (45) days after the latest to occur of the Termination Date of this Agreement, the Termination Date of the Single Family Agreement, if applicable, or disposition of all Assets pursuant to this Agreement or the Single Family Agreement, if applicable.

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-37

Colorado Capital Bank
City, State

**EXHIBIT 2.5**

## TRUE-UP

Pursuant to Section 2.5 of this Agreement, the following calculation applies to determine any payment due by the Assuming Institution to the Receiver on the True-Up Date. All capitalized terms used in this Exhibit 2.5 have the meanings defined or referenced in Article 8 of this Agreement.

$$X = \frac{A-(B+C+D)}{2}$$

Where:

$X$ = the amount payable to the Receiver pursuant to Section 2.5

$A$ = 20% of the Intrinsic Loss Estimate

$B$ = 20% of the Net Loss Amount

$C$ = 25% of the Asset discount bid, expressed in dollars, of total Shared-Loss Assets on Schedules 4.15A and 4.15B as of the Bank Closing Date

$D$ = 3.5% of total Shared-Loss Assets on Schedules 4.15A and 4.15B as of the Bank Closing Date

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-38

Colorado Capital Bank
City, State

## SCHEDULE 4.15B

### LOANS SUBJECT TO LOSS SHARING UNDER THE COMMERCIAL SHARED-LOSS AGREEMENT

### TO BE PROVIDED POST BANK CLOSING

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-45

Colorado Capital Bank
City, State

## SCHEDULE 4.15D

## SHARED-LOSS SUBSIDIARIES


## NONE

Module 1 – Whole Bank w/ Optional Shared Loss Agreements
Version 3.1.1 – COMMERCIAL SHARED-LOSS AGREEMENT
April 27, 2011

C-46

Colorado Capital Bank
City, State