IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 11-cv-01220-RM-BNB

TRIAD BANK, a Missouri chartered bank,

Plaintiff,

v.

FIRST-CITIZENS BANK & TRUST COMPANY, a North Carolina chartered commercial bank,

Defendant.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

This matter arises on **Defendant's Motion to Dismiss Second Amended Complaint** [Doc. #65, filed 12/20/2013] (the "Motion"). I respectfully RECOMMEND that the Motion be GRANTED.

## I. STANDARD OF REVIEW

The defendant seeks dismissal of the Second Amended Complaint on the basis that the court lacks subject matter jurisdiction over the plaintiff's claims. The standard of review for a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) is described as follows:

> Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject

> matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.
>
> However, a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case.

Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995) (citations omitted).

## II.  BACKGROUND

The Second Amended Complaint [Doc. #57] (the "Complaint") contains the following allegations:

1.  Colorado Capital Bank ("CCB") was closed by the Colorado Division of Banking on July 8, 2011. *Complaint*, ¶ 2. Immediately thereafter, defendant First-Citizens Bank & Trust Company ("First-Citizens") acquired most of the assets and assumed most of the liabilities of CCB pursuant to a Purchase and Assumption Agreement between First-Citizens and the Federal Deposit Insurance Corporation (the "FDIC") in its corporate capacity as receiver for CCB. Id. at ¶ 4.

2.  The plaintiff, Triad Bank ("Triad"), is a participant in real estate loans in which CCB was the lead or agent bank. Id. at ¶ 1.

3.  The assets purchased by First-Citizens include the loans which are the subject of this proceeding. Id. at ¶ 4.

4. Some time prior to October 17, 2008, CCB agreed to loan $2,700,000 to Chanin-Maxwell, LLC, for a residential development called Maxwell Place in Longmont, Colorado (the "Chanin-Maxwell Loan"). The Chanin-Maxwell Loan was secured by a mortgage on Maxwell Place. Id. at ¶ 10.

5. On or about October 17, 2008, Triad and CCB entered into a participation agreement (the "Chanin-Maxwell Participation Agreement") under which Triad agreed to purchase a $2,000,000 participating interest in the $2,700,000 Chanin-Maxwell Loan. Id. at ¶ 11. The terms of Triad's purchase and repayment were as follows:

> Participant shall be required to pay the purchase price for the Participation only after Seller has advanced Seller's entire share of the principal of the Loan. Repayments of the Loan (by repayment or by enforcement of collateral) shall be first paid to Participant until all of the Participant's purchase price, and accrued interest, and repayment of contributions to fees and expenses have been paid in full, whereupon Participant will have no further interest in the Loan.

Id. at ¶ 12 and Attachment A to Exhibit 1.

6. In March 2010, CCB determined that Chanin-Maxwell lacked the financial means to complete the Maxwell Place development. At that point, $1,855,000 of the loan had been funded, with Triad having funded $1,150,000 of that amount. Id. at ¶ 13.

7. On March 31, 2010, Triad and CCB entered into a new participation agreement (the "Maxwell Participation Agreement") under which:

    a. CCB would loan $1,855,000 to a new borrower, Maxwell Place, LLC;

    b. Using the new $1,855,000 loan, Maxwell Place, LLC would purchase the outstanding Chanin-Maxwell Loan;

    c. Maxwell Place would through foreclosure or deed in lieu of foreclosure take over all right, title, and interest in the proposed Maxwell Place development and complete the residential development;

    d. CCB would commit to an additional loan of $1,245,000 in order to complete the infrastructure for Maxwell Place, which loan would be subordinate to the $1,855,000 loan (the "Subordinated Loan"); and

    e. Triad would participate on a pro rata basis in the $1,855,000 loan without being required to advance any new funds.

Id. at ¶¶ 14-15 and Ex. 2.

    8. The pro rata provision states:

> Participant shall make payments pro rata with Seller's advances of principal on the Loan. Payments on the Loan (including accrued interest and repayment of contributions to fees and expenses) shall be distributed pro rata between Seller and Participant.

Id. at ¶ 16 and Attachment A to Ex. 2.

    9. On February 23, 2011, CCB told Maxwell Place, LLC, and Triad that it would not fund the $1,245,000 Subordinated Loan. To date, neither CCB nor First-Citizens has funded the Subordinated Loan. Id. at ¶ 17.

    10. First-Citizens has assumed all obligations and commitments of CCB to fund the Subordinated Loan and all liabilities related to CCB's breach in failing to do so. Id. at ¶ 18. Specifically, sections 2.1 and 1.3 of the Purchase and Assumption Agreement provide:

> **Liabilities Assumed by Assuming Institution**.  The Assuming Institution [First-Citizens] expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform and discharge, all of the following liabilities of the Failed Bank [CCB] as of the Bank Closing Date, except as otherwise provided in this Agreement (such liabilities referred to as "**Liabilities Assumed**"); . . .
>
>     (j)   liabilities, if any, for Commitments.
>
>                           \* \* \*
>
> "**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of [CCB] to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on [CCB] as of the Bank Closing Date, other than extensions of credit pursuant to the credit card business and overdraft protection plans of [CCB], if any.

Id. at ¶¶ 19-20.

11.  At the time of the Purchase and Assumption Agreement, the Subordinated Loan was unfunded; CCB's approval of and commitment on the Subordinated Loan was reflected in their records; and the Subordinated Loan was legally binding on CCB.  Id. at ¶¶ 21-23.

12.  CCB did not fund the Subordinated Loan, and First-Citizens continues to fail to fund the Subordinated Loan despite its assumption of the obligation to do so under the Purchase and Assumption Agreement.  Id. at ¶ 24.  CCB and First-Citizens have breached the Maxwell Participation Agreement by failing to fund the Subordinated Loan.  Id. at ¶ 25.

13.  On or about September 29, 2008, Triad and CCB entered into a participation agreement under which Triad agreed to purchase a $783,328 participating interest in a loan totaling $1,293,186 from CCB to Right Sky Properties, LLC, for a retail development ("First Right Sky Participation Agreement").  Id. at ¶ 28 and Ex. 3.

14.  On or about October 2, 2008, Triad and CCB entered into a second participation agreement under which Triad agreed to purchase a $1,216,672 participating interest in a second

loan totaling $2,008,588 from CCB to Right Sky Properties, LLC, for the same retail development (the "Second Right Sky Participation Agreement").

15. The loans underlying both the First and Second Right Sky Participation Agreements are in default, and First-Citizens has exercised its rights to recover against the collateral. First-Citizens has obtained $842,301.46, which it now holds in escrow pending the outcome of this case. Id. at ¶ 30.

16. The loan underlying the Maxwell Place Participation Agreement is in default and First-Citizens has obtained certain funds and exercised its rights to recover against the collateral. First-Citizens has obtained $803,399.10, which it now holds in escrow pending the outcome of this case. Id. at ¶ 31.

17. The FDIC and First-Citizens entered into a Shared Loss Agreement in conjunction with the Purchase and Assumption Agreement. Under the Shared Loss Agreement, First-Citizens will recover 80% of any losses incurred on the assumed loan portfolio purchased through the FDIC, including losses incurred from the loans underlying both the First and Second Right Sky Participation Agreements and the Maxwell Place Participation Agreement. Id. at ¶ 32.

18. Under paragraph eight of both the First and Second Right Sky Participation Agreements and the Maxwell Place Participation Agreement, after payment of expenses, Triad is entitled to its pro rata share of any payment received by First-Citizens after default "from any source whatever." Id. at ¶ 33. First-Citizens has refused to pay Triad, acknowledge Triad's right to payment, acknowledge its receipt of shared loss recoveries, or account for any amounts received. Id. at ¶ 35.

In Claim One, Triad seeks money damages for CCB's and, "by virtue of its assumption of CCB's liabilities and obligations," First-Citizen's breach of the Maxwell Participation Agreement to fund the Subordinated Loan. In Claim Two, Triad seeks a declaration that, pursuant to the First and Second Right Sky Participation Agreements and the Maxwell Place Participation Agreement, it is entitled to receive its pro rata share of funds received by First-Citizens under a loss share agreement with the FDIC.

### III. ANALYSIS

First-Citizens argues that the court does not have jurisdiction over Triad's claims because the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821, bars jurisdiction in the absence of exhaustion of administrative remedies, and Triad did not exhaust its administrative remedies. First-Citizens raises a factual challenge to the court's subject matter jurisdiction. Bruce J. Pierce & Assocs., Inc. v. Resolution Trust Corp., 987 F.2d 663, 664 (10th Cir. 1993) (affirming the district court's decision that "it lacked subject matter jurisdiction because of plaintiff's failure to comply with the claims procedures for administrative review contained at 12 U.S.C. § 1821(d)"); Kosicki v. Nationstar Mortg., LLC, 947 F.Supp.2d 546, 553 (W.D.Pa. 2013) (characterizing a challenge to exhaustion of FIRREA's administrative remedies as a factual challenge). Triad does not contend that it pursued, was prevented from pursuing, or exhausted any administrative remedies. Rather, it argues that its claims are not subject to the administrative exhaustion requirements of FIRREA.

"Congress grants the FDIC primary authority to determine claims and provides for a judicial determination of claims only after the FDIC has either disallowed the claim or failed to act upon the claim." F.D.I.C. v. Updike Bros., Inc., 814 F.Supp. 1035, 1039 (D.Wyo 1993)

7

(citing 12 U.S.C. §§ 1821(d)(3) and 1821(d)(6)).  Section 1821(d)(13)(D) imposes a mandatory exhaustion requirement which precludes suit in federal court for claims that are not first presented to the FDIC:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over--
>
>> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>>
>> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

12 U.S.C. § 1821(d)(13)(D).

The party invoking the court's jurisdiction bears the burden to establish that federal jurisdiction does exist but, "since the courts of the United States are courts of limited jurisdiction, there is a presumption against its existence."  Basso v. Utah Power & Light Co., 495 F.2d 906, 909 (10th Cir. 1974).

In Claim One, "Triad seeks money damages for CCB's and (by virtue of its assumption of CCB's liabilities and obligations) [First-Citizens'] breach of an agreement to fund a subordinated loan to a borrower." *Complaint*, ¶ 1.  In Claim Two, "Triad seeks a declaration that it is entitled to receive its pro rata share of funds received by [First-Citizens] under [the Shared Loss Agreement] with the FDIC in accordance with provisions in the Maxwell Place Participation Agreement and the First and Second Right Sky Participation Agreements."  Id. Triad does not contend that it submitted any administrative claims to the FDIC.  Consequently,

the key inquiry is whether Triad's claims fall within the scope of FIRREA. If so, the court is without jurisdiction to hear them.

Although Triad's claims are currently asserted against First Citizens, they are essentially pre-receivership claims or had their genesis in the pre-receivership conduct of CCB. Under FIRREA, the FDIC had the discretion to determine whether Triad was entitled to any money under its contractual agreements with CCB:

> The receiver may, in the receiver's discretion and to the extent funds are available, pay creditor claims which are allowed by the receiver, approved by the Corporation pursuant to a final determination pursuant to paragraph (7) or (8), or determined by the final judgment of any court of competent jurisdiction in such manner and amounts as are authorized under this chapter.

12 U.S.C. § 1821(d)(10).

The plaintiff's rights under its contracts with CCB could have and should have been asserted to the FDIC through the administrative process after CCB went into receivership. In this forum, Triad would have learned whether its participating interests would be paid.[1] Therefore, Triad's claims are subject to the exhaustion requirement mandated by FIRREA.

"The ultimate purpose behind FIRREA's exhaustion scheme is to allow the receiver to perform its statutory function of promptly determining claims so as to quickly and efficiently resolve claims against a failed institution without resorting to litigation." Nepstad v. F.D.I.C.,

---

[1]First Citizens has submitted the affidavit of the Senior Vice President in the Credit Resolution Group of First-Citizens, Peter Lindquist. Mr. Lindquist attests that First-Citizens did not acquire any portion of the participated amount of the Maxwell Place LLC and Right Sky Properties LLC loans. *Defendant's Reply in Support of Motion to Dismiss Second Amended Complaint* [Doc. #69], Ex. 1. Although I make no determination regarding this issue, Mr. Lindquist's attestation serves to demonstrate the importance of presenting creditor claims to the FDIC under FIRREA's exhaustion provisions before filing suit in the district court.

No. 920CV-200-J, 1992 WL 455434 at *4 (D.Wyo. November 17, 1992) (internal quotations omitted) (quoting H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess. 418–19, reprinted in U.S.Code Cong. & Admin.News 86, 214–15; Rose v. Resolution Trust Corp., 938 F.2d 383, 396 (3d Cir. 1991)). Permitting Triad to avoid the jurisdictional bar imposed by FIRREA by asserting its claims against a successor in interest "would encourage the very litigation that FIRREA aimed to avoid." Village of Oakwood v. State Bank and Trust Co., 539 F.3d 373, 386 (6th Cir. 2008) (internal quotations and citations omitted).

## IV. CONCLUSION

For all of these reasons, I respectfully RECOMMEND that Defendant's Motion to Dismiss Second Amended Complaint [Doc. #65] be GRANTED and that this action be dismissed for lack of subject matter jurisdiction.[2]

Dated August 18, 2014.

BY THE COURT:

s/ Boyd N. Boland
United States Magistrate Judge

---

[2] Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections. A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000). A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review. United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).